**William G. Patton, as Administrator of the Estate of William Dallas Patton, Deceased, Plaintiff-Appellant, v. Homer Wallace, Defendant-Appellee.**

Gen. No. 65–35.

Fifth District.

April 6, 1966.

Beatty, Schooley and Theis, of Granite City (William L. Beatty, of counsel), for appellant.

Ralph T. Smith, of Alton, for appellee.

SMITH, J.

Plaintiff administrator appeals from an adverse judgment in a bench trial of a suit for wrongful death arising from the shooting in the leg of plaintiff's intestate by the defendant police officer. It is the second bench trial of the case. The first, based on four counts of ordinary negligence, resulted in a defendant's verdict on motion at the close of plaintiff's evidence. On appeal, the case was reversed and remanded for new trial. Just before the second trial, plaintiff dismissed all four counts of ordinary negligence and amended his complaint by adding Count V charging willful and wanton negligence. The case proceeded to trial on this count only with the evidence in the first trial again considered together with additional evidence on behalf of the defendant.

Defendant, a motorcycle policeman of the city of Alton, was parked at a filling station near the east city limits when he observed decedent proceeding west on Broadway, a principal thoroughfare in the city, at a high rate of

speed. Defendant started in pursuit with his siren and red light in operation. He heard tires squealing and observed Patton trying to extricate his car from a rear-end collision with another car which had stopped for a red light. It later developed that the stopped car was occupied by a girl friend of Patton's and her escort. The girl friend testified that Patton had talked with her by phone about an hour before the occurrence, did not discuss a date, and was not of a jealous disposition. Patton moved around the car he had hit and proceeded westward on Broadway about 60–70 mph with the defendant in pursuit. The chase continued for more than ¾th of a mile on Broadway.

The officer fired two shots into the air and then called to decedent two or three times to pull over to the curb. No response. Both vehicles turned south and the officer fired a shot into the side of the car as decedent was crowding him into the left-hand curb. The officer then fired again at the left-rear wheel of the car after the decedent again crowded him. Near the river levee, the decedent abandoned his car and ran towards the levee. The officer fired at his legs striking him just above the knee. The decedent dropped to one knee, then ran over the levee some 500 feet and into the Mississippi River toward a barge. He went under the barge and was dead when fished from under the barge some 45 minutes later. The incident began about 7:00 p. m. on July 21, 1957.

■ ■ The record thus shows that the decedent, after turning south toward the river, twice attempted to run the officer down or run him into the curb and into a building. Whether the intent of the decedent was only to deter, to ward off pursuit, to complete an aggravated battery, to maim, to commit mayhem, or actually to kill, rests with him in the grave—his lips are sealed. The siren, the red light, vocal calls, two shots into the air; one shot at the side of the car and one shot at the rear

231

wheels, accomplished nothing. They were all unheeded by the decedent. He displayed a contemptuous disregard for these warnings which would bring the ordinary individual to heel. His conduct from the time the curtain goes up on his activities until it goes down defies satisfactory explanation or understandable justification. Although offered every opportunity to desist, to halt, and to accept either interrogation or arrest, he chose flight and the irresponsible conduct reflected in this record. This was true before he was shot—it was true after he was shot. Such conduct does not mesh with that to be reasonably expected of the ordinary prudent citizen. We think it demonstrates either an indifference to or a conscious disregard for the decedent's own safety and for the safety of others and is properly characterized as willful and wanton. As such it is a bar to recovery if it may be said that it proximately contributed to his death. Zank v. Chicago, R. I. & P. R. Co., 17 Ill2d 473, 161 NE2d 848; Prosser, Law of Torts, 3rd Ed pp 64, 436.

The body was disinterred some three weeks after burial and an autopsy was performed on the lower extremities. The physician testified in detail concerning the bullet wound, stated that it might or could have caused death, and that "at the time I conducted my examination, there was no medical way to determine whether the cause of death was drowning. The body was in a fair state of decomposition." He further testified concerning the bullet wound:

". . . Regardless of what might have been the actual cause of death this was a contributing factor. I did not dispute the fact that the boy might have died from drowning. Drowning might very easily have occurred. If this individual had received treatment for the wound which I found in the leg at the time of my examination, within a reasonable time after the wound was inflicted, I would not expect death.

Normally, I would not expect it to be fatal under those circumstances. . . ."

When the plaintiff asked the doctor whether the bullet damage could have been a factor contributing to the drowning, the doctor answered:

"Well, any one of several things when you combine them together I think you have more of a shocking procedure. I think that with the amount of blood lost that I know of with the amount of blood which the individual would have lost in covering the five hundred feet distance and subsequent immersion I think it would be reasonable to expect that the individual couldn't defend himself properly."

Based on the doctor's testimony, we think it a fair conclusion that the actual cause of death is in limbo and that the decedent contributed to such cause by immersing himself in the river, and being unable to rescue himself after such immersion through loss of blood in running 500 feet after he was shot. The immersion and the running are the unequivocal, voluntary acts of the decedent compatible with the reckless irresponsible conduct he had pursued since we first met him in this record. Had he halted when hit, he would not have drowned and in all probability would not have bled to death. "I would not expect it to be fatal under the circumstances." It is certain that his own conduct after the shot effectively removed any chance for assistance that might or could have preserved his life. Under the medical testimony whether death would have ensued is doubtful. It is certain that his own conduct after the shot effectively removed any chance for assistance that might or could have preserved his life. It seems clear that the latter clearly demonstrates a total indifference to and a conscious disregard for his own welfare and safety, and fails to establish his freedom

233

from willful and wanton misconduct which proximately contributed to his death. It seems clear to us that the exercise of reasonable precaution and proper circumspection might well have avoided his death. Carter v. Winter, 32 Ill2d 275, 204 NE2d 755. We would paraphrase the language of the Ohio Court of Appeals in Clark v. Carney, 71 Ohio App 14, 42 NE2d 938, in a somewhat similar situation when we ask how he or those claiming through him can complain of the results to which his own conduct so effectively contributed. The judgment of the trial court is not against the manifest weight of the evidence. The judgment of the trial court is correct and it is accordingly affirmed.

Affirmed.

TRAPP, P. J. and CRAVEN, J., concur.