**Roy Louis RIES, Jr., Plaintiff-Appellant,**

v.

**Robert J. LYNSKEY, Deputy Chief of Patrol 6th Area, et al., Defendants-Appellees.**

**No. 18512.**

United States Court of Appeals, Seventh Circuit.

Sept. 3, 1971.

Rehearing Denied Oct. 18, 1971.

Richard Rieser, Jr., Lawrence M. Cohen, William E. Rattner, Chicago, Ill., for plaintiff-appellant.

Peter Fitzpatrick, Sp. Asst. Corp. Counsel, Richard L. Curry, Corp. Counsel, Chicago, Ill., for defendants-appellees; Marvin E. Aspen, Asst. Corp. Counsel, Chicago, Ill., of counsel.

Before CASTLE, Senior Circuit Judge, and KILEY and PELL, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from a jury verdict and judgment against the plaintiff and for the City of Chicago in a suit in which Ries, the plaintiff, sought recovery for personal injuries allegedly received by him in Lincoln Park, during the period of the Democratic National Convention in 1968.

The second amended complaint, upon which the trial issues were ultimately formed, contained four counts. The first two counts proceeded on civil rights theories. The last two counts sought recovery under Illinois law, being based respectively on alleged intentional and alleged negligent acts. Defendants, in addition to the City of Chicago, were two supervisory Chicago police officials and unknown Chicago police officers designated as "John Doe."

The district court dismissed as to all defendants except Chicago, which remained as a defendant as to Count III only, on which count the case was tried.

Ries' first contention on appeal is that the district court erred in dismissing the civil rights counts as to the City of Chicago.

For this purpose, it is sufficient to note that Ries claimed he was assaulted by a city policeman but was unable to identify his assailant because of the prevailing darkness and the wearing of a gas mask and helmet by the officer. Some 200 photographs of policemen involved in the operation in question were made available to Ries by the city but viewing by him did not produce an identification.

The district court held that Chicago, a municipal corporation, was not liable in damages for the conduct of its agents under either 42 U.S.C. §§ 1983 or 1986, relying on Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Ries ingeniously argues that despite the rather clear language of Monroe v. Pape, it is not applicable here as there the wrongdoing police officers were identifiable defendants against whom the plaintiff had effective recourse. Here, he contends, since the policemen could not be identified, Ries was denied a federal remedy and since under Illinois law, a municipality is not immune from liability for tortious acts of police officers, he should be entitled to proceed in a civil rights action pursuant to 42 U.S.C. § 1988.[1]

We cannot agree. Our reading of Monroe v. Pape seems to leave no question that the congressional intent was to exclude municipalities from liability under the Civil Rights Act.

In Brown v. Town of Caliente, 392 F. 2d 546 (9th Cir. 1968), the court considered but rejected the contention that since sovereign immunity had been abolished in Nevada, the bar to action against a municipality established by Monroe v. Pape no longer was viable in cases arising from that state. The court pointed out that the Ninth Circuit as well as other circuits including this court (United States ex rel. Lee v. People of State of Illinois, 343 F.2d 120

1. 42 U.S.C. § 1988:

"The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and if it is of a criminal nature, in the infliction of punishment on the party found guilty."

(7th Cir. 1965)) had followed the holding of Monroe v. Pape.

Our attention has been directed to a recent decision to the contrary in the District of Columbia Circuit, Carter v. Carlson, 447 F.2d 358 (D.C.Cir. 1971). The District of Columbia Court conceded that the language in *Monroe* would seem to preclude a suit against the municipality under § 1983. That court, however, would limit the holding of *Monroe* to a suit for damages against a municipality which had been clothed in immunity by its parent state. The court finds that the intent of Congress was not to create municipal immunity but to defer to the immunity that existed under local common law. Accordingly, the court found that where a local law had abolished or narrowed the scope of municipal immunity, the scope of immunity under § 1983 should follow the local rule. The court found additional support under 42 U.S.C. § 1988.

However, it is to be noted that the persuasive effect of *Carter,* insofar as the present case is concerned, is considerably weakened in that the *Carter* court rested its decision on a second ground, namely that Congress could have had no doubts about its power to impose liability on the District of Columbia and that the considerations that led the *Monroe* court to exclude ordinary municipalities would have no application to the District.

The test here seems to us relatively simple. It is not whether the Congress in 1871 would have included a municipality within the definition of "person" if at the time municipalities generally had not had immunity under the common law of states but rather the test is what Congress meant to do at that time irrespective of the reasons leading to that action. What Congress meant to do, it seems clear from the exposition in *Monroe,* was to legislate that "person" did not include a municipality.

As reflected by other portions of the *Carter* opinion the development of the common law calls into play the power of courts to reflect changing philosophies and concepts governing human conduct. A statute, however, in the absence of an integrated flexibility freezes the meaning of the legislative body as of the time of passage. Changes therein should be accomplished by the legislature. Interpretation, but not the rewriting of statutes, is the province of the courts. Statutory construction should not be the handmaiden of legislative amendment.

We are not convinced that the policy arguments in any event are all one-sided. If a city is to be subject to § 1983 liability when a police officer cannot be identified, as suggested by plaintiff, it is not unreasonable to think that the lure of a financially responsible defendant might tend to lessen the number of identifications. Also, the fact that the city might be liable under § 1983 might well be accompanied by a lessening of the feeling of individual responsibility on the part of officers who would be aware that they were no longer the prime target in the event of violation of civil rights. However, we do not need to concern ourselves with the policy arguments pro or con as the interpretation of the particular statute has already been accorded finality. Monroe v. Pape, *supra.*

We do not decide the matter because of any policy belief that a city should have legislative immunity but simply because of our opinion that they do have such immunity under this particular statute. Nor have we decided the point on the basis that there is much in the record to indicate that the same result would have been reached if the case had also been submitted under the civil rights counts.

Ries' remaining contentions pertain to claimed trial errors with regard to instructions and failure to direct a verdict on liability for the plaintiff or in the alternative to grant judgment n. o. v. For consideration of these claims, it is necessary we turn in some greater detail to the factual situation involved.

Lincoln Park is a large, wooded recreational area immediately north of Chicago's near north side and bounded on the east by the drive along Lake Michigan. A large number of people had assembled in the park on Saturday and Sunday, August 24 and 25, 1968. On the following Monday evening, the number was estimated at from 3500 to 4000 people. There was no contention that the assemblage was that of people using the recreational facilities of the park in the normal manner.

There was an eleven o'clock curfew applicable to this park pursuant to ordinance.[2] On both Saturday and Sunday night there had been a sweep or clearing of the park. Some injuries had occurred on Sunday night and there had been arrests on that night. A planning meeting was held at police headquarters with regard to the anticipated situation on Monday evening. There were approximately 400 police immediately available for the park and surrounding area plus some 80 special Task Force police with the usual possibility of emergency call for police from other parts of the city.

In addition to the police meeting on Monday, there was also a meeting of interested clergymen. Ries, who at that time was a student at McCormick Theological Seminary, attended the meeting. It was decided that the clergy should try to reduce the mounting hostilities in the park by circulating through the park, passing out leaflets. It was testified that the thought was that the park could be cleared without confrontation.

At 10 p. m., at a time when there was growing tension in the park and at a time when if police officers or police vehicles went any place near the crowd they became the target of missiles, some 50 or 60 clergymen and seminarians went into the park in groups of five. According to the evidence, they wore clerical collars and white arm bands bearing a black cross. This was true of

Ries. The leaflet which was passed out apparently anticipated difficulty because in addition to specifying "Emergency Crash Pads" at various churches in the area, the leaflet specified the location of a first aid center and legal aid and also a telephone number for bail bond. The police over loudspeakers began to announce the closing of the park about 10:30 p. m. At 11:00 p. m., pursuant to an earlier agreement among themselves, about half of the clerical group came to the edge of the park to confer as to what they had seen and heard and to decide what to do next. Thereafter plaintiff Ries and two other seminarians reentered the park together but not in a group of five. A barricade of considerable size had been built by the crowd near a statute of Garibaldi, composed of benches, tables, trash cans and the like, which incorporated the statue as a part thereof.

Ries himself testified that the mood of the crowd after 11 o'clock was tense. He saw the barricade and estimated that there were approximately 2000 people in the immediate area. The people in the crowd picked up anything that they could lay their hands on and threw in the direction of the police. Ries and a fellow seminarian decided "we should stay between the crowd and the police." Periodically they turned around to see what was happening with the police. There were some lights but basically the area was dark. A line of police was formed and the command was given to use gas to avoid direct confrontation. Ries stated that he knew a provocative confrontation would take place but claimed that he was attempting to urge the people to leave the park and was holding his arms up for that purpose. He saw "a lot of people throw missiles toward the Task Force." These were thrown over his head and he admitted that it would have been a prudent limitation on the presence of the ministry not to be between people throwing things at the police and the police. The overall situation is aptly de-

---

2. Code of the Chicago Park District, §,17–27.

scribed in the closing argument of one of Ries' counsel:

"So what did they [the clerical group] see when they got there around 10:00 o'clock? We have had varying testimony but, again, there is really no dispute. It was an unruly madhouse, a mad, hostile crowd. It is hard to describe; hard to describe an entire crowd. Some people were there having fun; some people were there bent on hurting police. There were all sorts of people there. They all together formed a mob. There is no question. Had they not been there, the police wouldn't have been there. Had they not both been there, the clergy wouldn't have been there.

"They found a barricade. The clergy didn't build the barricade, they saw the barricade. Park benches, trash baskets, boughs from trees, anything.

"The crowd was throwing things at the police, anything they could pick up. There was some evidence of tiles being taken off of walls and thrown. It was a very dangerous situation for the police. And, as I think anyone knows, the police are not going to take that. They don't have to take that. They are going to come back at the people. The clergy knew it; wanted to prevent it."

There was testimony that as the Task Force advanced, they became invisible in the dark and in the smoke and that undercover agents had advised the police that weapons had been brought to the park to be utilized against the police officers by firing upon them from trees, then dropping the weapons and running.

Ries, apparently at a time when he was not looking back toward the oncoming police line, heard running footsteps behind him, turned and looked over his shoulder and was struck in the face by the butt of a shotgun held by one of the police officers. The fellow seminarian, Alger, testified that he heard plaintiff cry out and turned to see plaintiff doubled over on the ground about thirty feet away from him with three police officers over him and that plaintiff was struck again in the head with a shotgun as he lay on the ground.

A phrase which frequently runs through both briefs and judicial opinions is "the undisputed evidence showed." There was in fact no contrary evidence introduced as to the particular incident during which Ries allegedly received his injury. The fact that no policeman testified as to a different version than that offered by Ries and Alger could mean that the testimony was left undisputed because it was factually correct. It could, on the other hand, mean that the police, advancing as they obviously were into a frightening situation where any one of them could, as some did, have injuries inflicted upon him by missiles, did not in fact deliberately club anyone but in the move to clear the park those who appeared to be obstructing the progress were pushed, thereby falling underfoot and receiving injury.

It is entirely possible that no policeman had any memory of Ries as an individual nor of him in any sense other than as a part of the threatening mob which was being pushed out of the park. The present situation is not comparable to an automobile accident in which two parties are admittedly and knowledgeably involved with only one testifying as to what happened. The evidence in a true sense there is uncontradicted. Here with the possibility existing that the incident did not occur in such a fashion as to cause any policeman to be aware thereof, we cannot as clearly say that the lack of disputation imports some degree of verity. The jury had the oportunity of seeing and observing the witnesses and appraising their credibility. We have no way of knowing whether the jury may not have found the version recited incredible.

■ Because of the determination of factual and credibility questions, if for no other reason, in our opinion the district court properly overruled the motion for directed verdict and for judgment n. o. v.

Ries contends in effect that he as an ordinary prudent person could not have foreseen that as a natural and probable consequence of his activities he would be injured as a result of the use of excessive force on the part of a policeman. We agree that an ordinary prudent person should not be required to foresee, or anticipate, that a policeman would use force in excess of that reasonably called for by the exigencies of the circumstances then and there existing. To paraphrase the classic language of Judge Cardozo: The risk to one's safety reasonably to be perceived defines the duty to avoid that harm, and risk imports relation: it is the risk to one's safety within the range of reasonable apprehension. Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 169 N.E. 99, 59 A.L.R. 1253, 1256 (1928). We cannot find that as a matter of law the range was here exceeded. In so doing we are giving the plaintiff the benefit of the reasonable doubt created by the record in viewing the matter on the basis that his motives were not those of idle curiosity but were of the laudable character of attempting to prevent an incipient riot. In such a theater, the exact form of the harm may not be foreseen which does not mean that it is nonexistent.

It is in the above stated factual context, that we examine the claimed errors involving instructions. The principal claim, although referring to more than one instruction given by the court, revolved around the instructions the effect of which would be to permit the jury to find as a defense, wilful and wanton misconduct on the part of Ries, Zank v. Chicago, Rock Island and Pacific Railroad Co., 17 Ill.2d 473, 476, 161 N.E.2d 848 (1959). This was premised on the theory that Ries by his particular conduct at the time and under the circumstances in question was either indifferent to or was consciously disregarding his own safety so as to amount to contributory wilful and wanton conduct. Patton v. Wallace, 68 Ill.App.2d 229, 232, 216 N.E. 2d 1 (1966).

In determining this question we have had considerable difficulty in reviewing the instructions because of the nature of the record before us. We note from the record, which we have been willing to search, the instructions actually given by the court but the development of those instructions in the final form is exceedingly difficult to trace. In the record itself, during the colloquy on instructions prior to argument, the references are fragmentary and not clearly related to instructions tendered by specific number. Further, while the transcript contains what we assume are instructions which were tendered, they are not identified by plaintiff's or defendant's numbers so as to make the references clear during the colloquy on instructions. It is important, if not essential, to the reviewing court that an appellant under Rule 10, Fed.R.App.P., bring before this court all parts of the proceedings below necessary for a determination of the validity of any claimed error.

Thus here with regard to the defense of contributory and wilful conduct on the part of Ries, it is contended that the court failed to advise the jury that such conduct must be a proximate cause of the injuries received. The court did in his instruction define proximate cause which followed reference to the fact that the plaintiff was claiming that he was wilfully and wantonly disregarding his own safety but that the action of the police officers was the proximate cause of the injury. While scarcely qualifying for a model form book, if plaintiff complains that the feature of proximate cause was not sufficiently covered, the proper procedure would have indicated he tender such an instruction. Failing to do so we find this claim without merit. Lee v. Terminal Transport Co., 269 F.2d 97, 99 (7th Cir. 1959); Miller v. New York Central Railroad Co., 239 F.2d 10, 13 (7th Cir. 1956).[3]

3. As indicated in the opinion the record is insufficient to indicate the exact language of all of the tendered instructions. Apparently Ries did originally tender

A broader question, and one of more significance, is Ries' contention that the evidence was such as to make the issue of contributory wilful and wanton conduct improper in any event. We, therefore, again look at the record and glean from it what we can, bearing in mind that the purpose of Rules 46 and 51, Fed.R.Civ.P., is to inform the trial judge of possible errors so that he may have an opportunity to consider his rulings and if necessary correct them. Miller v. New York Central Railroad Co., *id.*

The record disclosed the following. When instructions were being settled, the city objected to a wilful and wanton instruction tendered by Ries "because if he is suing us on 'wilful and wanton' I am entitled to instruction that 'wilful and wanton' behavior is a defense." The city offered to tender such an instruction. Ries responded that if it was a defense it meant that he had to be acting in reckless disregard of his life or intentionally. The court interjected to Ries that if he got a verdict he would not want a new trial on the basis that the instruction had been refused. Ries responded that there was an Illinois case on the subject involving a speeding motorist [presumably referring to Patton v. Wallace, *supra*, 68 Ill.App.2d 229, 216 N.E.2d 1] and said that it is the disregard of other people's lives that makes it wilful and wanton and that did not exist in the present case. He further asserted that there was no evidence to justify the issue and that Ries was not being wilful and wanton just because he was there in the park.

The court stated that he would let the attorneys decide it because "if I should prove to be wrong by refusing to instruct, then there is a problem." Ries stated "I think that wilful and wanton is

some type of an instruction on proximate cause which he later withdrew as indicated by the following discussion:

"THE COURT: All right. Here it is. All right. No. 10 is refused.

"11, 'Proximate cause'—no, no, that is given, and so it is refused.

a defense to wilful and wanton, but I don't think that is a question. \* \* \* " The city countered by stating that this should not be in generalities and if there was an objection [the sentence was not finished but presumably it was meant that if there was an objection it should be stated.] The city was asked where its instruction was and Ries responded that he would see how pernicious it was. The instruction was a definition of wilful to which Ries replied that that was one of his instructions. The city said they had had one and would find it and the matter was passed for the time being.

When they returned to the subject, the court pointed out that the defendant's instruction was the same as the plaintiff's.

The following discussion then took place:

"Mr. Fitzpatrick [Counsel for City]: Oh, excuse me.

"Now, did you want some other definition here? 'When I use the expression "contributorily negligent," I mean wilful or wanton conduct on the part of the plaintiff \* \* \* '—well, now, wait a minute.

"The Court: You want a definition of wilful and wanton conduct.

"Mr. Smith [Counsel for Ries]: That's right.

"Mr. Fitzpatrick: Well, now, wait a minute, I will withdraw mine. He has his definition right in there.

"The Court: Do you mean 'a course of action which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety?'

"Mr. Fitzpatrick: Now, that's his instruction. So I will withdraw mine.

"Mr. Smith: Right.

"MR. RATTNER [Counsel for Ries]: Withdraw."

We are unable to tell from the record whether this did anything more than define proximate cause, which the court had already indicated he would do by another instruction.

"Mr. Rattner [Counsel for Ries]: Fine.

"The Court: So I will give his. That's a better one."

Following an off-the-record discussion, the court inquired as to whether Ries was going to give an instruction which summarizes "your intention" thing. To which Ries responded, "That is right." There was no further discussion, nothing further by way of objection and the arguments proceeded.

During final argument, counsel for city devoted a part of his argument to the matter of one having an utter indifference and a conscious disregard for his own personal safety. This argument was permitted to go in with the only objection, if it can be called that, from Ries being "Your Honor, I believe that you are competent to instruct them on the law." Here the court replied he expected to, that counsel was explaining his theory of the case.

Following completion of the arguments but before the instructions were given to the jury one of the counsel for Ries stated he would like to object to an instruction regarding "wilful and wanton contributory conduct" on the basis that there was no evidence of such conduct on the part of the plaintiff.

The court then stated the following:

"The Court: Well, counsel, before you spend much time on this, I received the impression at the conference yesterday—in fact, I almost left this at your option at the time that we discussed the matter, as to whether there should be or should not be an instruction. At one point along the line I more or less indicated that I was going to go ahead without such an instruction. I then posed the question— I only did this, I posed the question as to what the effect might be on a verdict that you might obtain if it should develop that such an instruction should be given, or should have been given.

Following that, at least, I received the distinct impression that you had no objection to the giving of such an instruction and you did not—I don't think that the record will show that you did object to it. We were trying to figure out what the language of the instruction should be.

"Now, the case has been argued to the jury on the basis that such an instruction will be given and I think that it would be manifestly unfair at this time to change the rules of the game." [4]

The city then pointed out again that the instruction which was going to be read had the plaintiff's number on it and thereafter the following significant colloquy took place.

"Mr. Fitzpatrick: There isn't any question that their position at the conference was agreeable to the giving of the instruction. I agree with the court.

"The Court: Well, this was my impression also.

"If there had been some question about it, but it doesn't seem to me— well, I even made the statement at the conference, and maybe that's what led you to looking up the cases, but I made the statement that, 'Well, is there evidence to justify it?' And then we talked the matter over.

"I think that a jury—actually, insofar as the instruction is concerned, I think that a jury could reasonably conclude on the basis of this evidence that a man who walks into the middle of a situation such as this might be considered guilty of wilful and wanton or a reckless disregard for his own safety, that's what it amounts to, doesn't it?

"Mr. Rieser [Counsel for Ries]: Yes, your Honor.

"The Court: Well, I am going to give the instruction, of course."

4. Indeed, Ries' counsel in final argument claimed that Ries had a perfect right to do what he did do in the park, which, of course, in effect, states that he was not consciously indifferent to his own safety.

■ While a literal reading of Rule 51, Fed.R.Civ.P., would permit an objection to be made at any time before the jury retires to consider its verdict and while conceivably instructions could be so clearly erroneous as to require this *in extremis* point, in our opinion the district court ruled properly in the factual situation here involved.

The instructions as actually given include the following:

"When I use the expression, 'wilful and wanton conduct,' I mean a course of action which shows an utter indifference to, or conscious disregard for, a person's own safety.

"Now, when I use the expression 'wilful and wanton conduct' in this case, I mean a course of action which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to, or conscious disregard for, a person's own safety."

In view of the fact that the two instructions are almost identical, it appears clear that the court did give the instruction as tendered by the plaintiff and then gave it again for some reason as an instruction tendered by the defendant, the defendant having withdrawn its own.

The matter however, was not concluded at this point because after the jury retired, it sent a note to the court inquiring whether it was possible to receive a copy of the instructions. Ries indicated no objection to a procedure of having the reporter play back the instructions from the recording machine but stated that there was a typographical error in the definition of the expression "wilful and wanton conduct," that such conduct must be considered from both sides but that the definition in the instructions by the use of the words "person's own safety" applied it only to Ries. He further stated:

"Now, that would be true of contributory wilful and wanton, but certainly not of the policemen.

"I think that if we struck out 'own' so that it said ' * * * disregard for a person's safety * * * ' *it would be all right.*" (Emphasis supplied.)

In accordance with this request, the word "own" was excised from one of the definitions of wilful and wanton conduct.

On the basis of the record, which we have felt it was necessary to set out in substantial detail, we find no basis for the claim of error. United States v. Vasen, 222 F.2d 3, 5 (7th Cir. 1955).

It is easy enough in calm retrospect to criticize instructions, the final wording of which has been hammered out in the heat of the trial atmosphere, but we have attempted in the same spirit of calm detachment to view the instructions here from the point of view of whether the giving or failure to give brought about an unfair trial. We are not convinced such was the case.

■ Ries also complains that the district court in instructing the jury on the curfew ordinance did not set forth the penalty portion of the ordinance and that the court refused to instruct on the Illinois statute dealing with the degree of force a policeman can use when attempting to arrest someone who is resisting arrest. Ries was not arrested for a violation of the curfew ordinance nor for any other claimed offense. We do not find sufficient relevance in either of these proposed instructions to make their refusal a matter of reversible error, nor do we find from the record before us that Ries unsuccessfully tendered any other instruction dealing with the degree of force usable by police in non-arrest situations.

From a view of the entire record we are satisfied that Ries was afforded a fair trial and accordingly the judgment of the district court is affirmed.

Affirmed.