## MOOR ET AL. *v.* COUNTY OF ALAMEDA ET AL.

No. 72–10.   Argued February 27, 1973—Decided May 14, 1973

Marshall, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Blackmun, Powell, and Rehnquist, JJ., joined. Douglas, J., filed a dissenting opinion, *post*, p. 722.

*Ronald M. Greenberg* argued the cause and filed briefs for petitioners.

*Peter W. Davis* argued the cause for respondents. With him on the brief was *Raoul D. Kennedy.*

Mr. Justice Marshall delivered the opinion of the Court.

This case raises three distinct questions concerning the scope of federal jurisdiction. We are called upon to decide whether a federal cause of action lies against a municipality under 42 U. S. C. §§ 1983 and 1988 for the actions of its officers which violate an individual's federal civil rights where the municipality is subject to such liability under state law. In addition, we must decide whether, in a federal civil rights suit brought against a municipality's police officers, a federal court may refuse to exercise pendent jurisdiction over a state law claim against the municipality based on a theory of vicarious liability, and whether a county of the State of California is a citizen of the State for purposes of federal diversity jurisdiction.

In February 1970, petitioners Moor and Rundle [1] filed separate actions in the District Court for the Northern District of California seeking to recover actual and punitive damages for injuries allegedly suffered by them as a result of the wrongful discharge of a shotgun by an Alameda County, California, deputy sheriff engaged in quelling a civil disturbance. [2] In their complaints, petitioners named the deputy sheriff, plus three other deputies, the sheriff, and the County of Alameda as defendants. The complaints alleged both federal and state causes of action.

The federal causes of action against the individual defendants were based on allegations of conspiracy and intent to deprive petitioners of their constitutional rights of free speech and assembly, and to be secure from the deprivation of life and liberty without due process of law. These federal causes of action against the individual defendants were alleged to arise under, *inter alia,* 42 U. S. C. §§ 1983 and 1985, and jurisdiction was asserted to exist under 28 U. S. C. § 1343.

---

[1] Named as plaintiffs in the *Rundle* case in addition to petitioner William D. Rundle, Jr., were his guardian *ad litem,* William D. Rundle, and Sarah Rundle. William D. Rundle and Sarah Rundle are also petitioners here, but for ease of discussion we will refer simply to petitioner Rundle.

[2] Neither complaint specifically states any claim for equitable relief. Furthermore, the complaints contain no allegations of an ongoing course of conduct, irreparable injury, inadequacy of legal remedy, or other similar allegations generally found in complaints seeking equitable relief. Throughout the course of this litigation the petitioners have given no indication that they seek equitable, as well as legal, relief. Before this Court the petitioners state nothing more than that "[p]laintiffs in both cases seek damages from the defendants . . . ." Brief for Petitioners 4. Therefore, the question on which our Brother DOUGLAS hinges his dissent—namely, whether a municipality may be sued for equitable relief under § 1983—simply is not presented here.

As to the County, both the federal and state law claims were predicated on the contention that under the California Tort Claims Act of 1963, Cal. Govt. Code § 815.2 (a), the County was vicariously liable for the acts of its deputies and sheriff committed in violation of the Federal Civil Rights Act.[3] The federal causes of action against the County were based on 42 U. S. C. §§ 1983 and 1988,[4] and thus jurisdiction was also alleged to exist with respect to these claims under 28 U. S. C. § 1343. Both petitioners argued before the District Court that it had authority to hear their state law claims against the County under the doctrine of pendent jurisdiction. In addition, petitioner Moor who alleged that he was a citizen of Illinois asserted in his complaint that the District Court also had jurisdiction over his state law claim against the County on the basis of diversity of citizenship.[5]

Initially, the defendants answered both complaints denying liability, although the County admitted that it had consented to be sued.[6] Thereafter, the County, arguing lack of jurisdiction, moved to dismiss all of the claims against it in the *Rundle* suit and to dismiss the federal civil rights claims in the *Moor* suit. The County relied upon this Court's decision in *Monroe* v. *Pape*, 365

---

[3] Although the County vigorously disputes the petitioners' construction of § 815.2 (a) of the California Tort Claims Act, we do not pass upon the parties' conflicting constructions since the question was not decided by either of the courts below.

[4] In their complaints, petitioners also asserted causes of action under 42 U. S. C. §§ 1981 and 1986. But before this Court petitioners have restricted their arguments to §§ 1983 and 1988. Hence, only those sections are now before us.

[5] Petitioner Rundle alleged in his complaint that he was a citizen of California, and therefore he was unable to assert jurisdiction over his state law claims on the basis of diversity of citizenship.

[6] See Answer to Complaint, *Moor* v. *Madigan*, App. 12; Answer to Complaint, *Rundle* v. *Madigan*, App. 29.

U. S. 167, 187–191 (1961), as having resolved that a municipality is not a "person" within the meaning of 42 U. S. C. § 1983, and on this basis alone it considered the civil rights claims against it to be barred. Moreover, in *Rundle,* the County argued that since there was before the District Court no claim against the County as to which there existed an independent basis of federal jurisdiction, it would be inappropriate to exercise pendent jurisdiction over the state law claim against it.

The District Court agreed with the County's arguments and granted the motion to dismiss the *Rundle* suit. It, however, postponed ruling in the *Moor* case pending consideration of possible diversity jurisdiction over the state law claim against the County in that case. Subsequently, the County sought to have the state law claim in *Moor* dismissed on the basis that it was not a citizen of California for purposes of diversity jurisdiction. While this motion was pending, a motion for reconsideration of the order dismissing the County was filed in the *Rundle* case. Following argument with respect to the jurisdictional issues, the District Court entered an order in *Moor* holding that there was no diversity jurisdiction and incorporating by reference an order filed in the *Rundle* case which again rejected petitioners' civil rights and pendent jurisdiction arguments. Upon the request of the petitioners, the District Court, finding "no just reason for delay," entered a final judgment in both suits with respect to the County under Fed. Rule Civ. Proc. 54 (b), thereby allowing immediate appeal of its jurisdictional decisions.[7]

---

[7] Subsequent to this decision with respect to the County, the District Court denied the individual defendants' motion to dismiss or, in the alternative, for summary judgment. The District Court also denied petitioners' motion for summary judgment. See Ex. A to Reply Brief for Petitioners.

The two cases were then consolidated for purposes of appeal, and the Court of Appeals for the Ninth Circuit affirmed the District Court with respect to all three issues raised by the two cases, 458 F. 2d 1217 (1972). In addition to rejecting petitioners' arguments concerning the existence of pendent jurisdiction and diversity jurisdiction over the state law claims, the Court of Appeals disagreed in particular with petitioners' contention that § 1988 alone established a federal cause of action against the County for their injuries on the basis of California law which created vicarious liability against the County for the actions of its officers that violated petitioners' federal civil rights. Because of the importance of the questions decided by the Court of Appeals, we granted certiorari. 409 U. S. 841 (1972). For reasons stated below, we now affirm that portion of the Court of Appeals' decision which held that petitioners had failed to establish a cause of action against the County under 42 U. S. C. §§ 1983 and 1988, and that the trial court properly refused to exercise pendent jurisdiction over the state law claims. We reverse, however, its holding that the County is not a citizen of California for purposes of federal diversity jurisdiction.

I

We consider first petitioners' argument concerning the existence of a federal cause of action against the County under 42 U. S. C. § 1988. Petitioners' thesis is, in essence, that under California law the County has been made vicariously liable for the conduct of its sheriff and deputy sheriffs which violates the Federal Civil Rights Acts [8] and that, in the context of this case, § 1988 authorizes the adoption of such state law into federal law in order to render the Civil Rights Acts fully effective,

---

[8] See 42 U. S. C. § 1981 *et seq.*

thereby creating a federal cause of action against the County.

Section 1988 reads, in relevant part, as follows:

> "The jurisdiction in civil . . . matters conferred on the district courts by [the Civil Rights Acts] . . . , for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies . . . , the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . ."

The starting point for petitioners' argument is this Court's decision in *Monroe* v. *Pape,* 365 U. S. 167 (1961). There the Court held that 42 U. S. C. § 1983, which was derived from § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, was intended to provide private parties a cause of action for abuses of official authority which resulted in the deprivation of constitutional rights, privileges, and immunities.[9] At the same time, however, the

---

[9] Section 1983 provides:

"Every' person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Court held that a municipality is not a "person" within the meaning of § 1983. *Id.*, at 187–191. Petitioners do not squarely take issue with the holding in *Monroe* concerning the status under § 1983 of public entities such as the County. Instead, petitioners argue that since the construction placed upon § 1983 in *Monroe* with respect to municipalities effectively restricts the injured party in a case such as this to recovery from the individual defendants, the section cannot be considered to be fully "adapted" to the protection of federal civil rights or is "deficient in the provisions necessary to furnish suitable remedies" within the meaning of § 1988. In petitioners' view, the personal liability of the individual defendants under § 1983 is, as a practical matter, inadequate because public officers are frequently judgment-proof.[10] Thus, petitioners contend it is appropriate under § 1988 for this Court to adopt into federal law the California law of vicarious liability for municipalities—that is, the "common law, as modified . . . by . . . statutes of the State wherein the court having jurisdiction of such civil . . . cause is held." Having thus introduced the State's law of vicarious liability into federal law through § 1988, they then assert that there is federal jurisdiction to hear their federal claims against

---

[10] See, *e. g.*, Kates & Kouba, Liability of Public Entities Under Section 1983 of the Civil Rights Act, 45 S. Cal. L. Rev. 131, 136–137, 157 (1972); Note, Philadelphia Police Practice and the Law of Arrest, 100 U. Pa. L. Rev. 1182, 1208–1209 (1952); cf. *Lankford* v. *Gelston*, 364 F. 2d 197, 202 (CA4 1966).

Before this Court the parties have disagreed as to the extent of the individual defendants' personal assets and insurance that might be available to satisfy any favorable final judgment which petitioners might ultimately obtain. See Brief for Respondents 15; Tr. of Oral Arg. 25; *id.*, at 50–51. In light of our conclusion as to the limited function of § 1988 in the scheme of federal civil rights legislation we have no occasion here to pass upon the adequacy of the relief available against the individual defendants.

the County under 28 U. S. C. § 1343 (4). Section 1343 (4) grants jurisdiction to the federal district courts to hear any civil action "commenced by any person . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ," and § 1988 is, petitioners say, such an "Act of Congress."

Petitioners in this case are not asking us to create a substantive federal liability without legislative direction. See *United States* v. *Standard Oil Co.,* 332 U. S. 301 (1947); cf. *United States* v. *Gilman,* 347 U. S. 507 (1954). It is their view, rather, that in § 1988 Congress has effectively mandated the adoption of California's law of vicarious liability into federal law. It is, of course, not uncommon for Congress to direct that state law be used to fill the interstices of federal law.[11] But in such circumstances our function is necessarily limited. For although Congress may have assigned to the process of judicial implication the task of selecting in any particular case appropriate rules from state law to supplement established federal law, the application of that process is restricted to those contexts in which Congress has in fact authorized resort to state and common law.[12] Cf. *Richards* v. *United States,* 369 U. S. 1, 7–8 (1962). Considering § 1988 from this perspective, we

---

[11] A ready example of such federal adoption of state law is to be found in the Federal Tort Claims Act under which the United States is made liable for certain torts of its employees in accordance with relevant state law. See 28 U. S. C. §§ 1346 (b); 2671–2680. See also *Richards* v. *United States,* 369 U. S. 1, 6–10 (1962). Still other examples are the Outer Continental Shelf Lands Act, 43 U. S. C. §§ 1331–1343, and the provisions of the Assimilative Crimes Act which provides for punishment as federal crimes of acts, committed within the maritime or territorial jurisdiction of the United States, that would have been punishable as a crime under the laws of the State, territory, or district where committed, 18 U. S. C. §§ 7, 11.

[12] Hence, this is a wholly different case from those in which,

are unable to conclude that Congress intended that section, standing alone, to authorize the federal courts to borrow entire causes of action from state law.

First, petitioners' argument completely overlooks the full language of the statute. Section 1988 does not enjoy the independent stature of an "Act of Congress providing for the protection of civil rights," 28 U. S. C. § 1343 (4). Rather, as is plain on the face of the statute, the section is intended to complement the various acts which do create federal causes of action for the violation of federal civil rights.[13] Thus, § 1988 specifies that "[t]he jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter [Civil Rights] and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States." But inevitably existing federal law will not cover every issue that may arise in the context of a federal civil rights action.[14] Thus, § 1988 proceeds to au-

---

lacking any clear expression of congressional will, we have been called upon to decide whether it is appropriate to look to state law or to fashion a single federal rule in order to fill the interstices of federal law. See, e. g., United States v. Yazell, 382 U. S. 341 (1966); Bank of America National Trust & Savings Assn. v. Parnell, 352 U. S. 29 (1956); Holmberg v. Armbrecht, 327 U. S. 392 (1946); Clearfield Trust Co. v. United States, 318 U. S. 363 (1943); D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U. S. 447 (1942).

[13] See, e. g., 42 U. S. C. §§ 1981, 1982, 1983, 1985. See also 18 U. S. C. §§ 241–245.

[14] One such problem has been the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant. Although an injured party's personal claim was extinguished at common law upon the death of either the injured party himself or the alleged wrongdoer, see W. Prosser, Torts 888–891 (4th ed. 1971), it has been held that pursuant to § 1988 state survivorship statutes which reverse the common-law rule may be used in the context of actions brought under § 1983. See, e. g., Brazier v. Cherry, 293

thorize federal courts, where federal law is unsuited or insufficient "to furnish suitable remedies," to look to principles of the common law, as altered by state law, so long as such principles are not inconsistent with the Constitution and laws of the United States.

The role of § 1988 in the scheme of federal civil rights legislation is amply illustrated by our decision in *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969). In *Sullivan,* the Court was confronted with a question as to the availability of damages in a suit concerning discrimination in the disposition of property brought pursuant to § 1982 which makes no express provision for a damages remedy.[15] The Court concluded that "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies," *id.,* at 239, and proceeded to construe § 1988, which provides the governing standard in such a case, to mean "that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes. . . . The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired." *Id.,* at 240.[16] Properly viewed, then, § 1988 instructs federal courts as to what law to apply in causes of actions arising under federal civil rights acts. But we do not believe that the section, without more, was meant to authorize the wholesale importation into federal law of state causes

F. 2d 401 (CA5 1961); *Pritchard* v. *Smith,* 289 F. 2d 153 (CA8 1961).

[15] Section 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

[16] See also *McDaniel* v. *Carroll,* 457 F. 2d 968 (CA6 1972), and cases cited n. 14, *supra.*

of action [17]—not even one purportedly designed for the protection of federal civil rights.

This view is fully confirmed by the legislative history of the statute: Section 1988 was first enacted as a portion of § 3 of the Civil Rights Act of April 9, 1866, c. 31, 14 Stat. 27. Section 1 of that Act is the source of 42 U. S. C. § 1982, the provision under which suit was brought in *Sullivan*. The initial portion of § 3 of the

---

[17] We know of no lower court decision that has held otherwise. To the contrary, the lower federal courts have repeatedly rejected the argument § 1988 independently creates a federal cause of action for the violation of federal civil rights. See *Pierre* v. *Jordan*, 333 F. 2d 951, 958 (CA9 1964); *Otto* v. *Somers*, 332 F. 2d 697, 699 (CA6 1964); *Post* v. *Payton*, 323 F. Supp. 799, 802–803 (EDNY 1971); *Johnson* v. *New York State Education Dept.*, 319 F. Supp. 271, 276 (EDNY 1970), aff'd, 449 F. 2d 871 (CA2 1971), vacated and remanded on other grounds, 409 U. S. 75 (1972); *Dyer* v. *Kazuhisa Abe*, 138 F. Supp. 220, 228–229 (Haw. 1956), rev'd on other grounds, 256 F. 2d 728 (CA9 1958); *Schatte* v. *International Alliance of Theatrical Stage Employees and Moving Picture Operators of United States and Canada*, 70 F. Supp. 1008 (SD Cal. 1947), aff'd, per curiam, 165 F. 2d 216 (CA9 1948); cf. *In re Stupp*, 23 F. Cas. 296, 299 (No. 13,563) (CCSDNY 1875).

Petitioners' reliance in this case upon *Hesselgesser* v. *Reilly*, 440 F. 2d 901, 903 (CA9 1971), and *Lewis* v. *Brautigam*, 227 F. 2d 124, 128 (CA5 1955), is misplaced. In *Hesselgesser*, the Court of Appeals ruled that a sheriff could be held vicariously liable in damages for the wrongful act of his deputy which deprived a prisoner of his civil rights where state law provided for such vicarious liability. The court, to be sure, found authority for the incorporation of state law into federal law in § 1988, but it was acting in the context of a suit brought against the sheriff on the basis of § 1983. Likewise in *Lewis*, where a sheriff was held to be liable for the civil rights violations of his deputies in light of state law which imposed such liability—a decision which also rested apparently upon § 1988, although that section was not specifically cited—the cause of action was properly based on § 1983. These decisions simply do not support the suggestion that § 1988 alone authorizes the creation of a federal cause of action against the County. And here, as discussed below, § 1983 is unavailable as a basis for suit against the County.

Act established federal jurisdiction to hear, among other things, civil actions brought to enforce § 1. Section 3 then went on to provide that the jurisdiction thereby established should be exercised in conformity with federal law where suitable and with reference to the common law, as modified by state law, where federal law is deficient.[18] Considered in context, this latter portion of § 3, which has become § 1988 and has been made applicable to the Civil Rights Acts generally, was obviously intended to do nothing more than to explain the source of law to be applied in actions brought to enforce the substantive provisions of the Act, including § 1.[19] To

[18] As enacted, § 3 read, in part, as follows:

"That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act . . . . The jurisdiction in civil and criminal matters hereby conferred on the district and circuit courts of the United States shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offences against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of the cause, civil or criminal, is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern said courts in the trial and disposition of such cause, and, if of a criminal nature, in the infliction of punishment on the party found guilty."

[19] Following the ratification of the Fourteenth Amendment in 1868, the Act of April 9, 1866, was re-enacted without change in the Act of May 31, 1870, c. 114, § 18, 16 Stat. 144. At the same time, Congress enacted what is now 42 U. S. C. § 1981. See Act of

hold otherwise would tear § 1988 loose from its roots in § 3 of the 1866 Civil Rights Act. This we will not do.

There is yet another reason why petitioners' reliance upon § 1988 must fail. The statute expressly limits the authority granted federal courts to look to the common law, as modified by state law, to instances in which that law "is not inconsistent with the Constitution and laws of the United States." Yet if we were to look to California law imposing vicarious liability upon municipalities, as petitioners would have us do, the result would effectively be to subject the County to federal court suit on a federal civil rights claim. Such a result would seem to be less than consistent with this Court's prior holding in *Monroe* v. *Pape,* 365 U. S., at 187–191, that Congress did not intend to render municipal corporations liable to federal civil rights claims under § 1983. See, *e. g., Brown* v. *Town of Caliente,* 392 F. 2d 546 (CA9 1968); *Ries* v. *Lynskey,* 452 F. 2d 172, 174–175 (CA7 1971); *Brown* v. *Ames,* 346 F. Supp. 1173, 1176 (Minn. 1972); *Wilcher* v. *Gain,* 311 F. Supp. 754, 755 (ND Cal. 1970).

Petitioners argue, however, that there is in fact no inconsistency between the interpretation placed upon

May 31, 1870, c. 114, § 16, 16 Stat. 144. Section 18 of the Act also provided that the provision now contained in § 1981 was to be enforced in accordance with the provisions of the Act of April 9, 1866. Thus, Congress again directed merely that § 1988 would guide courts in the enforcement of a particular cause of action, namely, that created in § 1981. Similarly, when 42 U. S. C. § 1983 was first enacted, it was made "subject to the same rights of appeal, review upon error, and other remedies provided in like cases . . . under the provisions of the act of the ninth of April, eighteen hundred and sixty-six . . . ." Act of Apr. 20, 1871, c. 22, § 1, 17 Stat. 13. Codification saw § 1988 made into § 722 of the Revised Statutes, with the statute being made generally applicable to, *inter alia,* the Civil Rights portion of the Revised Statutes, see §§ 1977–1991.

§ 1983 in *Monroe* and the interpretation of § 1988 for which they now argue here. They suggest that *Monroe* involved no question of the susceptibility to suit of a municipality which has surrendered its common-law immunity under state law; the interpretation of § 1983 in *Monroe* was, in their view, premised upon an assumption that the municipality had not been deprived of its immunity. And Congress, petitioners argue, did not intend to exclude from the reach of § 1983 municipalities that have surrendered their immunity from suit under state law. Thus, they conclude that in a case such as this, where the municipality has lost its immunity, there is no inconsistency between § 1983 and the introduction of the state cause of action against the County into federal law under § 1988.

In effect, petitioners are arguing that their particular actions may be properly brought against this County on the basis of § 1983. But whatever the factual premises of *Monroe,* we find the construction which petitioners seek to impose upon § 1983 concerning the status of municipalities as "persons" to be simply untenable.

In *Monroe,* the Court, in examining the legislative evolution of the Ku Klux Klan Act of April 20, 1871, which is the source of § 1983, pointed out that Senator Sherman introduced an amendment which would have added to the Act a new section providing expressly for municipal liability in civil actions based on the deprivation of civil rights. Although the amendment was passed by the Senate,[20] it was rejected by the House,[21] as was another version included in the first Conference Committee re-

---

[20] Cong. Globe, 42d Cong., 1st Sess., 704–705 (1871). The proposed amendment is quoted in *Monroe* v. *Pape*, 365 U. S. 167, 188 n. 38 (1961).

[21] Cong. Globe, 42d Cong., 1st Sess., 725 (1871).

port.[22]   The proposal for municipal liability encountered strongly held views in the House on the part of both its supporters and opponents,[23] but the root of the proposal's difficulties stemmed from serious legislative concern as to Congress' constitutional power to impose liability on political subdivisions of the States.[24]

---

[22] *Id.*, at 800–801.   The version proposed by the Conference Committee report is quoted in *Monroe* v. *Pape*, 365 U. S., at 188–189, n. 41.

[23] The essence of the position taken by the supporters of the provision imposing vicarious liability on local municipalities for injuries suffered due to the violation of civil rights was "that by making the whole body of citizens insurers for the victims you will have a safeguard which no police arrangement can make, one more effective than any other . . . ."   Cong. Globe, 42d Cong., 1st Sess., 794 (1871) (remarks of Rep. Kelley).   See also *id.*, at 792 (remarks of Rep. Butler).   As to general view in opposition, see *id.*, at 788–789 (remarks of Rep. Kerr); *id.*, at 791 (remarks of Rep. Willard).

[24] For instance, Representative Kerr argued:

"I now come to inquire is it competent for the Congress of the United States to punish municipal organizations of this kind in this way at all, with or without notice?   My judgment is that such power nowhere exists; that it cannot be found within the limits of the Constitution; that its exercise cannot be justified by any rational construction of that instrument.   I hold that the constitutional power of the Federal Government to punish the citizens of the United States for any offenses punishable by it at all may be exercised and exhausted against the individual offender and his property; but when you go one inch beyond that you are compelled, by the very necessities which surround you, to invade powers which are secured to the States, which are a necessary and most essential part of the autonomy of State governments, without which there can logically be no State government." *Id.*, at 788.

Similarly, Representative Willard explained his opposition to the amendment as follows:

"Now, sir, the Constitution has not imposed, we have not by the Constitution imposed, any duty upon a county, city, parish, or any other subdivision of·a State, to enforce the laws, to provide protection for the people, to give them equal rights, privileges, and immunities.   The Constitution has declared that to be the duty

As in *Monroe,* we have no occasion here to "reach the constitutional question whether Congress has the power to make municipalities liable for acts of its officers that violate the civil rights of individuals." 365 U. S., at 191. For in interpreting the statute it is not our task to consider whether Congress was mistaken in 1871 in its view of the limits of its power over municipalities; rather, we must construe the statute in light of the impressions under which Congress did in fact act, see *Ries* v. *Lynskey,* 452 F. 2d, at 175. In this respect, it cannot be doubted that the House arrived at the firm conclusion that Congress lacked the constitutional power to impose liability upon municipalities, and thus, according to Representative Poland, the Senate Conferees were informed by the House Conferees that the "section imposing liability upon towns and counties must go out or we should fail to agree." [25] To save the Act, the proposal for municipal liability was

---

of the State. The Constitution, in effect, says that no State shall deny to its citizens the equal protection of the laws, and I understand that that declaration, that prohibition, applies only to the States, so far as political or municipal action is concerned. But the State, within its boundaries, has the creation and the control of the laws for the protection of the people." *Id.,* at 791.

And Representative Poland contended:

"As I understand the theory of our Constitution, the national Government deals either with States or with individual persons. So far as we are a national Government in the strict sense we deal with persons, with every man who is an inhabitant of the United States, as if there were no States, towns, or counties; as if the whole country were in one general mass, without any subdivisions of States, counties, or towns. We deal with them as citizens or inhabitants of this great Republic. With these local subdivisions we have nothing to do. We can impose no duty upon them; we can impose no liability upon them in any manner whatever." *Id.,* at 793.

See also *id.,* at 795 (remarks of Rep. Blair); *id.,* at 798 (remarks of Rep. Bingham).

[25] *Id.,* at 804.

given up.[26]  It may be that even in 1871 municipalities which were subject to suit under state law did not pose in the minds of the legislators the constitutional problems that caused the defeat of the proposal.  Yet nevertheless the proposal was rejected *in toto*, and from this action we cannot infer any congressional intent other than to exclude all municipalities—regardless of whether or not their immunity has been lifted by state law—from the civil liability created in the Act of April 20, 1871, and § 1983.[27]  Thus, § 1983 is unavailable to these petitioners insofar as they seek to sue the County.  And § 1988, in light of the express limitation contained within it, cannot be used to accomplish what Congress clearly refused to do in enacting § 1983.

Accordingly, we conclude that the District Court properly granted the motion to dismiss the causes of action brought against the County by petitioners under § 1983 and § 1988.

## II

Although unable to establish a federal cause of action against the County on the basis of the California law

---

[26] All reference to municipal liability was deleted from the provision submitted by the Conference Committee, and it was enacted as 42 U. S. C. § 1986, which imposes liability upon any person who has "knowledge [of] any of the wrongs conspired to be done, and mentioned in" 42 U. S. C. § 1985.

[27] Petitioners argue that merely because "Congress [did] not intend, as a matter of federal law, to impose vicarious liability upon a public entity for violations of the Civil Rights Acts committed by the entity's employees," it does not follow "that Congress also intended to preclude a state from imposing such vicarious liability as a matter of state law."  Reply Brief for Petitioners 4–5.  Certainly this is true.  But this fact does not assist petitioners, for the very issue here is ultimately what Congress intended federal law to be, and, as petitioners themselves recognize, Congress did not intend, *as a matter of federal law*, to impose vicarious liability on municipalities for violations of federal civil rights by their employees.

imposing vicarious liability on a municipality for the actions of its officers that violate federal civil rights, petitioners contend that the District Court nevertheless had jurisdiction to hear their state law claims of vicarious liability against the County under the doctrine of pendent jurisdiction.

Petitioners rely principally upon the decision in *Mine Workers* v. *Gibbs*, 383 U. S. 715, 725 (1966), where the Court eschewed the "unnecessarily grudging" approach of *Hurn* v. *Oursler*, 289 U. S. 238 (1933), to the doctrine of pendent jurisdiction. *Gibbs* involved a suit brought under both federal and state law by a contractor to recover damages allegedly suffered as a result of a secondary boycott imposed upon it by a union. There existed independent federal jurisdiction as to the federal claim, but there was no independent basis of jurisdiction to support the state law claim. Nevertheless, the Court concluded that federal courts could exercise pendent jurisdiction over the state law claim.

In deciding the question of pendent jurisdiction, the *Gibbs* Court indicated that there were two distinct issues to be considered. First, there is the issue of judicial power to hear the pendent claim. In this respect the Court indicated that the requisite "power" exists

> "whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ,' U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. . . . The state and federal claims must derive from a common nucleus of operative fact. But

if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." *Id.,* at 725 (footnotes omitted).

Yet even if there exists power to hear the pendent claim, "[i]t has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them . . . ." *Id.,* at 726. By way of explanation of the considerations which should inform a district court's discretion, the Court in *Gibbs* suggested, *inter alia,* that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law," *ibid.,* and that "reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, [may] justify separating state and federal claims for trial," *id.,* at 727. In *Gibbs,* the Court found that the exercise of pendent jurisdiction over the state law claims was proper both as a matter of power and discretion.

In these cases, there is no question that petitioners' complaints stated substantial federal causes of action against the individual defendants under 42 U. S. C. § 1983. See *Monroe* v. *Pape,* 365 U. S. 167 (1961). Nor is there any dispute that the federal claims against the individual defendants and the state claims against the individual defendants may be said to involve "a common nucleus of operative fact." But, beyond this,

there is a significant difference between *Gibbs* and these cases. For the exercise of pendent jurisdiction over the claims against the County would require us to bring an entirely new party—a new defendant—into each litigation. *Gibbs*, of course, involved no such problem of a "pendent party," [28] that is, of the addition of a party which is implicated in the litigation only with respect to the pendent state law claim and not also with respect to any claim as to which there is an independent basis of federal jurisdiction. Faced with this distinction, the courts below concluded that the exercise of pendent jurisdiction in the context of these cases was inappropriate as a matter of both judicial power and discretion.

As to the question of judicial power, the District Court and Court of Appeals considered themselves bound by the Ninth Circuit's previous decision in *Hymer* v. *Chai*, 407 F. 2d 136 (1969), wherein the court refused to permit the joinder of a pendent plaintiff. Petitioners vigorously attack the decision in *Hymer* as at odds with the clear trend of lower federal court authority since this Court's decision in *Gibbs*. It is true that numerous decisions throughout the courts of appeals since *Gibbs* have recognized the existence of judicial power to hear pendent claims involving pendent parties where "the entire action before the court comprises but one constitutional 'case'" as defined in *Gibbs*.[29] *Hymer* stands virtually alone against this post-*Gibbs* trend in the courts

---

[28] See generally Note, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv. L. Rev. 657, 662–664 (1968).

[29] See *Almenares* v. *Wyman*, 453 F. 2d 1075, 1083–1085 (CA2 1971); *Leather's Best, Inc.* v. *S. S. Mormaclynx*, 451 F. 2d 800, 809–810 (CA2 1971); *Nelson* v. *Keefer*, 451 F. 2d 289, 291 (CA3 1971); *Astor-Honor, Inc.* v. *Grosset & Dunlap, Inc.*, 441 F. 2d 627 (CA2 1971); *F. C. Stiles Contracting Co.* v. *Home Insurance Co.*, 431 F. 2d 917, 919–920 (CA6 1970); *Beautytuft, Inc.* v. *Factory Ins. Assn.*, 431 F. 2d 1122, 1128 (CA6 1970); *Hatridge* v. *Aetna*

of appeals,[30] and significantly *Hymer* was largely based on the Court of Appeals' earlier decision in *Kataoka* v. *May Department Stores Co.*, 115 F. 2d 521 (CA9 1940), a decision which predated *Gibbs* and the expansion of the concept of pendent jurisdiction beyond the narrow limits set by *Hurn* v. *Oursler, supra*. Moreover, the exercise of federal jurisdiction over claims against parties as to whom there exists no independent basis for federal jurisdiction finds substantial analogues in the joinder of new parties under the well-established doctrine of ancillary jurisdiction in the context of compulsory counter-

---

*Casualty & Surety Co.*, 415 F. 2d 809, 816–817 (CA8 1969); *Stone* v. *Stone*, 405 F. 2d 94 (CA4 1968); *Connecticut General Life Ins. Co.* v. *Craton*, 405 F. 2d 41, 48 (CA5 1968); *Jacobson* v. *Atlantic City Hospital*, 392 F. 2d 149, 153–154 (CA3 1968); *Wilson* v. *American Chain & Cable Co.*, 364 F. 2d 558, 564 (CA3 1966). See also, *e. g., Eidschun* v. *Pierce*, 335 F. Supp. 603, 609–610 (SD Iowa 1971); *Thomas* v. *Old Forge Coal Co.*, 329 F. Supp. 1000 (MD Pa. 1971); *Newman* v. *Freeman*, 262 F. Supp. 106, 107–109 (ED Pa. 1966); *Johns-Manville Sales Corp.* v. *Chicago Title & Trust Co.*, 261 F. Supp. 905, 907–908 (ND Ill. 1966); *Morris* v. *Gimbel Brothers, Inc.*, 246 F. Supp. 984 (ED Pa. 1965). On occasion, decisions of district courts refusing to exercise jurisdiction over claims against pendent parties have been sustained on appeal simply on the ground that the decisions were not an abuse of discretion. See *Patrum* v. *City of Greensburg*, 419 F. 2d 1300, 1302 (CA6 1969); *Williams* v. *United States*, 405 F. 2d 951, 955 (CA9 1969).

[30] The only court of appeals decision outside of the Ninth Circuit cited to us by the County in support of its position is *Wojtas* v. *Village of Niles*, 334 F. 2d 797 (CA7 1964), a decision which preceded the expansion of pendent jurisdiction in *Mine Workers* v. *Gibbs*. A number of district courts, however, have refused to exercise jurisdiction over claims against pendent parties, generally relying on *Wojtas* and/or *Hymer* v. *Chai*. See, *e. g., Redden* v. *Cincinnati, Inc.*, 347 F. Supp. 1229, 1231 (ND Ga. 1972); *Payne* v. *Mertens*, 343 F. Supp. 1355, 1358 (ND Cal. 1972); *Barrows* v. *Faulkner*, 327 F. Supp. 1190 (ND Okla. 1971); *Letmate* v. *Baltimore & O. R. Co.*, 311 F. Supp. 1059, 1060–1062 (Md. 1970); *Tucker* v. *Shaw*, 308 F. Supp. 1, 9–10 (EDNY 1970); *Hall* v. *Pacific Maritime Assn.*, 281 F. Supp. 54, 61 (ND Cal. 1968);

claims under Fed. Rules Civ. Proc. 13 (a) and 13 (h),[31] and in the context of third-party claims under Fed. Rule Civ. Proc. 14 (a).[32] At the same time, the County counsels that the Court should not be quick to sweep state law claims against an entirely new party within the jurisdiction of the lower federal courts which are courts of limited jurisdiction—a jurisdiction subject, within the limits of the Constitution, to the will of Congress, not the courts.[33] Whether there exists judicial power to hear the state law claims against the County is, in short, a subtle and complex question with far-reaching implications. But we do not consider it appropriate to resolve this difficult issue in the present case, for we have concluded that even assuming, *arguendo,* the existence of power to hear the claim, the District Court, in exercise of its legitimate discretion, properly declined to join the claims against the County in these suits.

The District Court indicated, and the Court of Appeals agreed, that exercise of jurisdiction over the state law claims was inappropriate for at least two reasons. First, the District Court pointed out that it "would be

---

*Rosenthal & Rosenthal, Inc.* v. *Aetna Casualty & Surety Co.,* 259 F. Supp. 624, 630–631 (SDNY 1966).

[31] See, *e. g., H. L. Peterson Co.* v. *Applewhite,* 383 F. 2d 430, 433–434 (CA5 1967); *Albright* v. *Gates,* 362 F. 2d 928 (CA9 1966); *Union Paving Co.* v. *Downer Corp.,* 276 F. 2d 468, 471 (CA9 1960); *United Artists Corp.* v. *Masterpiece Productions, Inc.,* 221 F. 2d 213, 216–217 (CA2 1955); *Markus* v. *Dillinger,* 191 F. Supp. 732, 735 (ED Pa. 1961): cf. *Dewey* v. *West Fairmont Gas Coal Co.,* 123 U. S. 329 (1887); *Moore* v. *New York Cotton Exchange,* 270 U. S. 593, 608–609 (1926).

[32] See, *e. g., Pennsylvania R. Co.* v. *Erie Ave. Warehouse Co.,* 302 F. 2d 843, 844 (CA3 1962); *Southern Milling Co.* v. *United States,* 270 F. 2d 80, 84 (CA5 1959); *Dery* v. *Wyer,* 265 F. 2d 804, 807–808 (CA2 1959); *Waylander-Peterson Co.* v. *Great Northern R. Co.,* 201 F. 2d 408, 415 (CA8 1953).

[33] Cf. Shakman, The New Pendent Jurisdiction of the Federal Courts, 20 Stan. L. Rev. 262, 265–266, 270–271 (1968).

called upon to resolve difficult questions of California law upon which state court decisions are not legion." [34] In addition, the court felt that "with the introduction of a claim against the County under the California Tort Claims Act, with the special defenses available to the County, the case" which will be tried to a jury, "could become unduly complicated." [35]    As is evident from this Court's decision in *Gibbs*, 383 U. S., at 726–727, the unsettled nature of state law and the likelihood of jury confusion were entirely appropriate factors for the District Court to consider.    And those factors had to be weighed by the District Court against the economy which might be achieved by trying the petitioners' claims against both the police and the County in single proceedings.    In light of the broad discretion which district courts must be given in evaluating such matters, we cannot say that the District Judge in these cases struck the balance improperly. [36]    We therefore hold that

---

[34] *Rundle* v. *Madigan*, 331 F. Supp. 492, 495 n. 5 (ND Cal. 1971).

[35] *Ibid.*

[36] Since we hold in Part III that the County is a citizen of California for purposes of diversity jurisdiction, the state law claim against the County will in fact be before the District Court on remand in the *Moor* case.    But this fact does not in our opinion call for further consideration of the pendent jurisdiction issue by the District Court.    Given our decision in Part III, the issue of pendent jurisdiction is without further consequence for petitioner Moor.    And it is clear that the mere fact that the County will be before the District Court in petitioner Moor's case does not significantly affect the basis of the District Court's discretionary judgment with respect to petitioner Rundle's suit.    For counsel for petitioners specifically indicated at oral argument that the petitioners' suits were consolidated only for purposes of appeal, and that petitioners' "injuries are different and the cases will be tried separately," Tr. of Oral Arg. 47. Thus, even considering our decision in Part III as to petitioner Moor's claim against the County, we see no reason to upset the District Court's determination that it would not hear the complicating state law claim against·the County where, as in Rundle's suit, it

the District Court did not err, as a matter of discretion, in refusing to exercise pendent jurisdiction over petitioners' claims against the County.

## III

There remains, however, the question whether the District Court had jurisdiction over petitioner Moor's state law claim against the County on the basis of diversity of citizenship, 28 U. S. C. § 1332 (a). Petitioner Moor, a citizen of Illinois, contends that the County is a citizen of California for the purposes of federal diversity jurisdiction. The District Court concluded otherwise, however. For while acknowledging that there exists a substantial body of contrary authority, it considered itself "bound to recognize and adhere to the Ninth Circuit decisions which hold that California counties and other subdivisions of the State are not 'citizens' for diversity purposes," [37] see *Miller* v. *County of Los Angeles,* 341 F. 2d 964 (CA9 1965); *Lowe* v. *Manhattan Beach City School Dist.,* 222 F. 2d 258 (CA9 1955). Not surprisingly, the Court of Appeals also adhered to its prior precedents.

There is no question that a State is not a "citizen" for purposes of the diversity jurisdiction. That proposition has been established at least since this Court's decision in *Postal Telegraph Cable Co.* v. *Alabama,* 155 U. S. 482, 487 (1894). See also *Minnesota* v. *Northern Securities Co.,* 194 U. S. 48, 63 (1904). At the same time, however, this Court has recognized that a political subdivision of a State, unless it is simply "the arm or *alter ego* of the State," [38] is a citizen of the State for diversity purposes.

---

has a choice in light of the substantial element of discretion inherent in the doctrine of pendent jurisdiction.

[37] Appendix E to Pet. for Cert. 18–19.

[38] *State Highway Comm'n of Wyoming* v. *Utah Construction Co.,* 278 U. S. 194, 199 (1929).

See, *e. g., Bullard* v. *City of Cisco,* 290 U. S. 179 (1933);
*Loeb* v. *Columbia Township Trustees,* 179 U. S. 472,
485–486 (1900); *Chicot County* v. *Sherwood,* 148 U. S.
529, 533–534 (1893); *Lincoln County* v. *Luning,* 133
U. S. 529 (1890); *Cowles* v. *Mercer County,* 7 Wall. 118
(1869). The original source of this latter principle was
the rule that corporations are citizens of the State in
which they are formed, and are subject as such to the
diversity jurisdiction of the federal courts.[39] See, *e. g.,
Louisville, C. & C. R. Co.* v. *Letson,* 2 How. 497, 558–
559 (1844); *Barrow S. S. Co.* v. *Kane,* 170 U. S. 100,
106 (1898). Thus, in the seminal case of *Cowles* v.
*Mercer County, supra,* the Court held without hesita-
tion that an Illinois county, which under Illinois law
was a "body politic and corporate" and had been au-
thorized to sue and be sued, was subject to federal
diversity jurisdiction as a citizen of the State of Illi-
nois.[40] The principle first announced in *Cowles* has
become so firmly rooted in federal law that we were able
to say only last Term that "[i]t is well settled that for
purposes of diversity of citizenship, political subdivisions
are citizens of their respective States . . . ." *Illinois* v.
*City of Milwaukee,* 406 U. S. 91, 97 (1972).

The County in this case contends, however, that un-
like the counties of most States, it is not a municipal
corporation or an otherwise independent political sub-

---

[39] Under 28 U. S. C. § 1332 (c), a corporation is, of course, also
a citizen of "the State where it has its principal place of business."

[40] Indeed, Mercer County was able to point to a provision of state
law that limited liability of Illinois counties to suit in the circuit
courts of the county itself. Nevertheless, this Court concluded that
"no statute limitation of suability can defeat a jurisdiction given
by the Constitution," 7 Wall. 118, 122. Moreover, subsequent to
*Cowles,* the Court ruled that a county was subject to diversity
jurisdiction even where there was no state statute under which coun-
ties were authorized to sue and be sued. See *Chicot County* v.
*Sherwood,* 148 U. S. 529, 531, 533–534 (1893).

division, but that it is, under California law, nothing more than an agent or a mere arm of the State itself. In particular, the County cites to us Art. 11, § 1 (a), of the California Constitution which provides that "[t]he State is divided into counties which are legal sub-divisions of the State." The County thus apparently believes its status, for purposes of the diversity jurisdiction, to be governed by *Postal Telegraph Cable* rather than by *Cowles* and its progeny. Despite the County's contentions, a detailed examination of the relevant provisions of California law—beyond simply the generalization contained in Art. 11, § 1, of the state constitution—convinces us that the County cannot be deemed a mere agent of the State of California.

Most notably, under California law a county is given "corporate powers" [41] and is designated a "body corporate and politic." [42] In this capacity, a county may sue and be sued, [43] and, significantly for purposes of suit, it is deemed to be a "local public entity" [44] in contrast to the State and state agencies. [45] In addition, the county, and from all that appears the county alone, [46] is liable for all judgments against it and is authorized to levy taxes to pay such judgments. [47] A California county may also sell, hold, or otherwise deal in property, [48] and it may contract for the construction and repairs of structures. [49] The counties also are authorized to provide a variety of

---

[41] See Cal. Govt. Code § 23000.

[42] See *id.*, § 23003.

[43] See *id.*, §§ 945, 23004 (a).

[44] See *id.*, § 940.4.

[45] *See id.*, § 940.6.

[46] Thus, any liability on the part of the County as a result of this suit would be the County's alone; no obligation would arise with respect to the State.

[47] See Cal. Govt. Code § 50171.

[48] See *id.*, §§ 23004 (d), 25520–25539.

[49] See *id.*, §§ 23004 (c), 25450–25467.

public services such as water service, flood control, rubbish disposal, and harbor and airport facilities.[50]   Financially, the counties are empowered to issue general obligation bonds [51] payable from county taxes.[52]   Such bonds create no obligation on the part of the State, except that the State is authorized to intervene and to impose county taxes to protect the bondholders if the county fails to fulfill its obligations voluntarily.[53]   In sum, these provisions strike us as persuasive indicia of the independent status occupied by California counties relative to the State of California.

But even if our own examination were not sufficient for present purposes, we have the clearest indication possible from California's Supreme Court of the status of California's counties.   In *People ex rel. Younger* v. *County of El Dorado,* 5 Cal. 3d 480, 487 P. 2d 1193 (1971), the Attorney General of the State sought a writ of mandate against two California counties to compel them to pay out certain allotted monies.   Under state law, such a writ may be issued only to any "inferior tribunal, *corporation,* board, or person."   Cal. Civ. Proc. Code § 1085 (emphasis added).   In holding that the writ could be issued against the counties, the California Supreme Court said:

> "While it has been said that counties are not municipal corporations but are political subdivisions of the state for purposes of government . . . , *counties have also been declared public corporations or quasi-corporations. . . .*   In view of Government Code section 23003, which provides that a county is 'a body corporate and [politic],' and section 23004, subdivision (a) of the same code, which states that

---

[50] See *id.,* §§ 25690–26224.
[51] See *id.,* §§ 29900–29929.
[52] See *id.,* §§ 29922–29924.
[53] See *id.,* §§ 29925–29927.

counties may sue and be sued, we think that a *county is sufficiently corporate in character* to justify the issuance of a writ of mandate to it." 5 Cal. 3d, at 491 n. 12, 487 P. 2d, at 1199 n. 12 (emphasis added).

See also *Pitchess* v. *Superior Court,* 2 Cal. App. 3d 653, 656, 83 Cal. Rptr. 41, 43 (1969).

We do not lightly reject the Court of Appeals' previous conclusion that California counties are merely part of the State itself and as such are not citizens of the State for diversity purposes.[54] But in light of both the highest state court's recent determination of the corporate character of counties and our own examination of relevant California law, we must conclude that this County has a sufficiently independent corporate character to dictate that it be treated as a citizen of California under our decision in *Cowles* v. *Mercer County, supra.*

Thus, we hold that petitioner Moor's state law claim against the County is within the diversity jurisdiction.

---

[54] We do think it bears noting, though, that the Court of Appeals, in initially concluding in *Miller* v. *County of Los Angeles,* 341 F. 2d 964 (CA9 1965), that California counties were not citizens for diversity purposes, made no effort to analyze independently the status of California counties but simply rested its decision on its prior opinion in *Lowe* v. *Manhattan Beach City School Dist.,* 222 F. 2d 258, 259 (CA9 1955). *Lowe* in fact did not involve a suit against a California county but rather a suit against a California school district. And, in *Lowe* the Court of Appeals did not undertake any analysis of the legal character of even California school districts— much less California counties—but instead rested its decision on the equally conclusory order of the District Court, see *Lowe* v. *Manhattan Beach City School Dist.,* No. 16646–WM Civil (SD Cal. 1954), reprinted in Brief for Petitioners Appendix A. Moreover, district courts in States other than California within the Ninth Circuit have questioned the correctness of *Lowe* and *Miller,* and have refused to follow those decisions for counties of their own States. See *Universal Surety Co.* v. *Lescher & Mahoney, Arch. & Eng.,* 340 F. Supp. 303 (Ariz. 1972); *White* v. *Umatilla County,* 247 F. Supp. 918 (Ore. 1965).

Accordingly, we reverse the judgment of the Court of Appeals in this respect and remand this case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

The claims in the instant actions arose out of the May 1969 People's Park disturbance, in which petitioners were allegedly injured by an Alameda County deputy sheriff who was performing duties at that time on behalf of the County. Petitioners brought actions against several deputies, the sheriff, and the County. The complaints against the County alleged federal causes of action under the Civil Rights Acts, 42 U. S. C. §§ 1981, 1983, 1985, 1986, 1988, and pendent state claims under § 810 *et seq.* of the California Government Code. Both federal and state causes of action were premised on the theory that the County could be held vicariously liable for the acts of the deputies. The County subsequently filed motions to dismiss the claims against it in each case, contending that, as to the Civil Rights Act claims, the County was not a "person" who could be sued under the Act. The trial court ultimately granted these motions and ordered that all claims against the County be dismissed. The Court of Appeals affirmed these orders of the District Court, *Moor* v. *Madigan,* 458 F. 2d 1217 (CA9).

Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in-

jured in an action at law, suit in equity, or other proper proceeding for redress."

In *Monroe* v. *Pape,* 365 U. S. 167, we held that a municipality was not a "person" within the meaning of that Act. The issue was whether or not the Act made municipalities liable in damages, *id.,* at 187–191, that claim being strongly pressed because "private remedies against officers for illegal searches and seizures are conspicuously ineffective and because municipal liability will not only afford plaintiffs responsible defendants but cause those defendants to eradicate abuses that exist at the police level." *Id.,* at 191. We certainly said, as the Court holds, that a municipality was not a "person" within the meaning of § 1983. *Ibid.* But § 1983 permits equitable relief, as well as damages, not directly involved in *Monroe* v. *Pape* but a matter we explored at some length last Term in *Mitchum* v. *Foster,* 407 U. S. 225.

There may be overtones in *Monroe* v. *Pape* that even suits in equity are barred. Yet we never have so held. Certainly a residuum of power seems available in § 1983 to enjoin such bizarre conduct as the offering to the police of classes in torture. More realistically, § 1983 as construed in *Mitchum* v. *Foster* might under some circumstances authorize a federal injunction against a municipal prosecution of an offender. Such being my understanding of *Monroe* v. *Pape* and *Mitchum* v. *Foster,* I would hold that the County of Alameda in this case is a "person" within the meaning of § 1983 for a narrow group of equity actions and that therefore the District Court did not lack jurisdiction.

Although the complaint in the instant action asked for damages, it also prayed for any further relief that the court might deem just and proper. Since the complaint was dismissed at the threshold of the litigation, it is impossible to determine whether or not grounds for equitable

relief would have emerged during the normal course of the litigation. But the prayer for any "further relief" would embrace it.

In any event an amended complaint could make the matter clear beyond peradventure.

That raises the question as to the liability of the County of Alameda, by reason of 42 U. S. C. § 1988, which reads:

"The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty."

Under California law "[a] public entity may sue and be sued." (Govt. Code § 945), although a public entity has a general immunity from suit involving injury. *Id.*, § 815. Moreover, an officer, while generally immune, may become liable in damages, if he uses unreasonable force against a citizen, in which event the municipality loses its immunity. That at least is the way I read *Scruggs* v. *Haynes*, 252 Cal. App. 2d 256, 60 Cal. Rptr. 355.

Since § 1983 does not allow damages against the mu-

nicipality in a federal suit, federal laws "are not adapted to the object," and are "deficient in the provisions necessary to furnish suitable remedies," within the meaning of § 1988. While it is "inconsistent" with the "laws of the United States," as those words were used in § 1988, to enforce a *federal cause* of action for damages against the County of Alameda, it arguably is within the scheme of the *state cause* of action. This is not to allow state law to enlarge the scope of § 1983. Section 1983 by reason of its equity provision merely gives "jurisdiction" to the District Court, while § 1988 allows the District Court to apply state law.

As we said in *Mitchum* v. *Foster:*

"This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." 407 U. S., at 242.

The federal right here is not to obtain damages but to obtain some kind of equitable relief. Application by the federal court of a state cause of action for damages is therefore in harmony with both § 1983 and § 1988. As we stated in *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 240, "This means, as we read § 1988, that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes. . . . The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired." The federal right here is the alleged "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" as these words are used in § 1983.