Mike **MOORE**, Attorney General ex rel. **STATE OF MISSISSIPPI**, Plaintiff,

v.

**ABBOTT LABORATORIES, INC.**, Bristol–Myers Squibb Co. and Mead Johnson & Co., Defendants.

Civ. A. No. 3:95–CV–78BN.

United States District Court, S.D. Mississippi, Jackson Division.

Sept. 22, 1995.

28

John W. Barrett, Edward Sanders, Barrett Law Offices, Lexington, MS, for Mike Moore.

Ross F. Bass, Jr., Michael B. Wallace, Phelps Dunbar, Jackson, MS, for Abbott Laboratories and Mead Johnson & Co.

William F. Goodman, Jr., Lynn Plimpton Risley, Watkins & Eager, Jackson, MS, for Bristol–Myers Squibb and Company and Mead Johnson & Co.

## OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on the following motions: (1) Plaintiff's Motion to Remand; (2) Defendants' Motion for Leave to File Surreply Memorandum; and (3) Plaintiff's Application for Review and Objections to Magistrate Judge's Order Denying Motion to Quash and for Protective Order. Having considered the Motions, Responses, all attachments to each and supporting and opposing memoranda, the Court finds that (1) Plaintiff's Motion to Remand is well taken and should be granted; (2) Defendants' Motion for Leave to File Surreply Memorandum is well taken and should be granted; and (3) Plaintiff's Application for Review and Objections to Magistrate Judge's Order Denying Motion to Quash and for Protective Order is moot and therefore denied.

### I. Factual Background and Procedural History

Plaintiff filed this action on January 18, 1995, in the Circuit Court of Holmes County, Mississippi.[1] Defendants are pharmaceutical companies that manufacture and sell infant formula nationally, including in the State of Mississippi. According to the Plaintiff, Defendants share approximately eighty percent of the Mississippi infant formula market. Plaintiff further asserts the following:

For over twelve years, from 1980 through 1992, defendants abused their overwhelming dominance of the infant formula market by independent action and agreement among themselves, whereby they grossly overcharged Mississippi consumers for infant formula. Complaint at ¶ 15.

The substantial terms of defendants' conspiracy consisted of an agreement to fix the wholesale price of infant formula sold throughout the United States, including that sold in Mississippi. Complaint at ¶ 20. Defendants' illegal conspiracy and

1. Contrary to Defendants' assertion, this litigation did not begin on October 7, 1993. On that date, some of the same counsel who are prosecuting this suit filed a class action suit in this Court alleging that Defendants were engaged in an interstate conspiracy to raise, fix, maintain and stabilize at artificially high levels the wholesale prices of infant formula sold in the United States. *Cothran v. Abbott Laboratories, et al.,* Civil Action No. 3:93–CV–626LR (Oct. 7, 1993). The plaintiffs in that case voluntarily dismissed the case on November 8, 1993. The Court finds that these two cases, although related in subject matter, are not the same case for the purposes of the current Motion to Remand.

agreement caused the price of infant formula to increase over 120 percent during the last ten years, while the price of milk, infant formula's principal ingredient, rose only 36 percent. Complaint at ¶ 16. Because retailers determine their prices based on defendants' wholesale prices, the retail price of infant formula is directly affected by the wholesale prices charged by defendants. Complaint at ¶ 13. Therefore, as a direct result of defendants' illegal conspiracy, plaintiffs and class members paid more for infant formula than they would have absent defendants' illegal conduct. Complaint at ¶ 27–28.

Memorandum of Law in Support of Plaintiff's Motion to Remand at 1–2.

The Plaintiff in this matter is the Attorney General of the State of Mississippi who is suing on behalf of the State and as *parens patriae* on behalf of Mississippi citizens injured by Defendants' alleged misconduct. On behalf of the State, the Attorney General claims that Defendants' actions had the effect of requiring the State to pay artificially high prices for infant formula for the Mississippi Women, Infants and Children (WIC) Program. Plaintiff asserts that Defendants have thus violated certain provisions of the Mississippi antitrust statute, specifically Miss.Code Ann. §§ 75–21–1 and 75–21–3. Plaintiff seeks recovery for such violations under Miss.Code Ann. § 75–21–7, which sets forth certain penalties for violation of the Mississippi antitrust laws, and Miss.Code Ann. § 75–21–9, seeking a penalty of $500 for each instance of injury to the State.

Plaintiff also alleges violations of the Mississippi Consumer Protection Act, specifically Miss.Code Ann. § 75–24–5, asserting that Defendants have engaged in unfair competition and unfair or deceptive trade practices. As a result of Defendants' alleged wrongful actions, Plaintiff asserts that the State and the citizens of the State have paid more for infant formula than they would have paid in the absence of Defendants' alleged unlawful conduct. Plaintiff asserts a right to recover damages pursuant to Miss.Code Ann. § 75–24–15, in his capacity as *parens patriae* for the Mississippi citizens who have been injured by Defendants' alleged wrongful conduct.[2]

On February 17, 1995, Defendants removed this action to this Court on grounds of diversity of citizenship and federal question jurisdiction. Each of Defendants is a foreign corporation organized and existing under the laws of a state other than Mississippi. Defendants assert that the State of Mississippi, on whose behalf Mike Moore brought this suit, is not the real party in interest, and that the Attorney General has no *parens patriae* authority to bring suit on behalf of the citizens of the State. The real parties in interest, according to Defendants, are the private individuals who bought infant formula between 1980 and 1992, and these are the persons whose citizenship matters for the purposes of 28 U.S.C. § 1332. Defendants further assert that Plaintiff has engaged in artful pleading to avoid federal jurisdiction, and that Plaintiff's claims are not cognizable under Mississippi law.

## II. *Analysis*

28 U.S.C. § 1441(a) provides in relevant part as follows:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). "The removing party bears the burden of establishing federal jurisdiction." *Laughlin v. Prudential Ins. Co.*, 882 F.2d 187, 190 (5th Cir.1989) (citation omitted). Whether a case is removable must be determined by reference to the allegations

---

**2.** The Court notes that Miss.Code Ann. § 75–24–15 was amended in 1994 and the provision regarding attorneys' fees was removed from the statute. Plaintiff asserts a general right to recovery of attorneys' fees if successful on the merits of this suit. Defendants assert that Miss.Code Ann. § 75–24–19 now governs the recovery of attorneys' fees and only allows recovery to the Plaintiff when a violation of section 75–24–5 is knowing and willful. Defendants further assert that Mississippi law only allows the recovery of attorneys' fees when provided by statute. *Stokes v. Board of Directors of La Cav Improvement Co.*, 654 So.2d 524 (Miss.1995). The Court need not address this issue as it is not necessary for a decision on the Motion to Remand.

made in the original pleadings. *Wheeler v. Frito–Lay, Inc.,* 743 F.Supp. 483, 485 (S.D.Miss.1990).

### A. *Eleventh Amendment Immunity*

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The United States Supreme Court has interpreted this amendment on many occasions to determine when a suit is one against the State. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). That Court has held that " 'an unconsenting State is immune from suits brought by her own citizens as well as citizens of another state.' " *Id.* at 100, 104 S.Ct. at 908 (quoting *Employees v. Missouri Dept. of Public Health & Welfare,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973)). The Plaintiff in this matter asserts that "[t]he proscriptions of the Eleventh Amendment apply with equal force to a suit brought against a state in federal court, and a suit brought by a state in state court which is removed to federal court." Memorandum in Support at 16–17. Defendants do not directly address the issue of the Eleventh Amendment in their submissions to this Court.[3]

The Court has extensively researched this question and has found only a few federal court cases which even mention this issue. The Court has found only one case, however, which actually bases its ruling on the Eleventh Amendment issue. In *California v. Steelcase Inc.,* 792 F.Supp. 84 (C.D.Cal.1992), the court addressed the issue of Eleventh Amendment immunity where the plaintiff is the state and the case has been removed by the defendants. The court first concluded that the state is not a citizen of itself for diversity purposes. *Id.* at 86 (citing *Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973)).

The court then addressed the Eleventh Amendment immunity issue:

> Defendant, relying on the literal wording of the Eleventh Amendment, contends that this is not a "suit ... *against* one of the United States ..." (emphasis added) because the State is the plaintiff. However, since the immunity granted by the Eleventh Amendment is an immunity from being made an involuntary party to an action in federal court, it should apply equally to the case where the state is a plaintiff in an action commenced in state court and the action is removed to federal court by the defendant.
>
> The statute under which this action was removed requires, for an action to be removable, that the district courts "have original jurisdiction" over the action. 28 U.S.C. § 1441(a). Because of the jurisdictional bar of the Eleventh Amendment, the district courts would not have original jurisdiction over this action, absent the consent of the State. The State does not consent to removal. Therefore, subject matter jurisdiction is lacking, at least as to the claim under the unfair competition statute.

*Id.* at 86; *but see South Dakota State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.,* 778 F.Supp. 1515, 1522 (D.S.D. 1991) (declining to address the Eleventh Amendment claim with the State as the plaintiff in a motion to remand concluding that "[t]he contention that the Eleventh Amendment nevertheless has bearing upon this Court's jurisdiction is not supported by any authority cited by either party").

The Court finds the reasoning of the *Steelcase* court to be sound. By removing this matter to federal court, Defendants have involuntarily subjected the State of Mississippi to the jurisdiction of this Court. Because the State does not consent to this removal, the Court finds that it lacks subject matter jurisdiction over this action due to the Eleventh Amendment proscription, provided that the

---

**3.** While Defendants assert that the State is not the real party in interest in this lawsuit, Defendants fail to address whether the Eleventh Amendment prohibits the State, if it is the real party in interest, from being brought into federal court through the removal process as an involuntary plaintiff.

State of Mississippi is the real party in interest in this matter.

### B. *Real Party in Interest and Diversity Jurisdiction*

The real party in interest issue is relevant to the Eleventh Amendment immunity question as well as to a proper determination of diversity of citizenship. Because the Court has previously found that the Eleventh Amendment precludes the removal of this suit to federal court if the Plaintiff is the real party in interest, the Court will address the issues of real party in interest and diversity of citizenship together because the questions pertaining to each are somewhat intertwined.

Plaintiff asserts that the State of Mississippi is the real party in interest with regard to the *parens patriae* claims brought under the Mississippi antitrust statute and consumer fraud statute. Plaintiff further asserts that even if the Court determines that the State has no independent interest in the *parens patriae* claims, the State is still a real party in interest with regard to the statutory penalty and WIC claims. Therefore, according to Plaintiff, because the State is the real party in interest, there is no diversity in this matter because a state is not a citizen for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

Defendants assert that "the Attorney General is acting as the nominal party for a group of lawyers who want to mask what is in fact a private class action on behalf of Mississippi consumers of infant formula that would otherwise be barred by Mississippi law." Defendants' Joint Memorandum in Opposition at 3. Defendants further assert that Plaintiff's non-*parens patriae* claims have been fraudulently joined to defeat diversity jurisdiction. Therefore, according to Defendants, the State of Mississippi is not a real party in interest to this litigation, and diversity jurisdiction exists with regard to the Defendants and the true plaintiffs.

█ The Court need not decide whether the State of Mississippi has the authority to pursue *parens patriae* claims in the manner asserted in this case in order to dispose of this issue. Miss.Code Ann. § 75–21–7 (rev. 1991) provides as follows:

Any person, corporation, partnership, firm or association of persons and the officers and representatives of the corporation or association violating any of the provisions of this chapter shall forfeit not less than one hundred dollars ($100.00) nor more than two thousand dollars ($2,000.00) for every such violation. Each month in which such person, corporation or association shall violate this chapter shall be a separate violation, *the forfeiture and penalty in such case to be recovered alone by suit in the name of the state on the relation of the attorney general and by the consent of the attorney general suits may be brought by any district attorney, such suits to be brought in any court of competent jurisdiction.*

*Id.* (emphasis added). This statute clearly gives the Attorney General of the State the authority to bring suit in the name of the State for violations of Mississippi antitrust law. Furthermore, the Attorney General bringing suit in this capacity is merely the alter ego of the State, and the State is therefore the real party in interest. *See Tradigrain v. Mississippi State Port Authority*, 701 F.2d 1131, 1132 (5th Cir.1983).

█ In this case, the State is the real party in interest, therefore diversity jurisdiction does not exist. A state is not considered a citizen for the purposes of diversity jurisdiction under 28 U.S.C. § 1332. *Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Tradigrain*, 701 F.2d at 1132. Because the State of Mississippi is the real party in interest and is not a citizen for the purposes of diversity jurisdiction, removal on the basis of diversity jurisdiction was improper.

█ Defendants assert, however, that Plaintiff's statutory penalty claim was fraudulently joined by the Plaintiff in that such a claim cannot succeed as a matter of Mississippi law. This argument is not persuasive. The removing party bears the burden of demonstrating fraudulent joinder. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.) (citing *Laughlin v. Prudential Ins. Co.*, 882 F.2d 187, 190 (5th Cir.1989)), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112

L.Ed.2d 35 (1990). To prove fraudulent joinder, Defendants must establish that Plaintiff has no possibility of establishing a cause of action against them in state court. *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir.1992).

> In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling state law in favor of the nonremoving party. We are then to determine whether that party has any possibility of recovery against the party whose joinder is questioned.... We do not decide whether the plaintiff will actually or even probably prevail on the merits, but look only for a possibility that he may do so.... If that possibility exists, then " 'a good faith assertion of such an expectancy in a state court is not a sham ... and is not fraudulent in fact or in law.' "

*Id.* at 42–43 (citations omitted); *see also Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815–16 (5th Cir.) (concluding that all factual allegations must be viewed in the light most favorable to the plaintiff in determining the issue of fraudulent joinder), *cert. denied,* — U.S. ——, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993).

The Court finds that Defendants have failed to establish fraudulent joinder in this matter.[4] Defendants argue vehemently that Mississippi antitrust law is limited to intrastate conspiracies. Defendants argue legislative history, cite Mississippi cases regarding legislative intent and quote from authoritative treatises to support their argument. Curiously absent from Defendants' argument, however, is any decision by the Mississippi Supreme Court concerning whether the Mississippi antitrust statute is limited in application to intrastate conspiracies. The Court finds that Plaintiff has stated an arguably valid claim on the face of the Complaint, pursuant to Miss.Code Ann. §§ 75–21–1, 75–21–3 and § 75–21–7, the penalty provision of the antitrust statute. Even if that claim is ambiguous under state law, the Mississippi state courts are the proper forum for determining this issue of state law which has not

yet been decided by the highest court in Mississippi.

■ Defendants can therefore only secure removal of this case, based upon diversity jurisdiction, by proceeding under 28 U.S.C. § 1441(c) which permits the removal of a claim joined to a nonremovable claim if it is "separate and independent" from the nonremovable claim. *McKay v. Boyd Constr. Co.*, 769 F.2d 1084, 1087 (5th Cir.1985). The *McKay* court concluded that section 1441(c) must be construed narrowly "to reduce the number of cases removable from state to federal court." *Id.* at 1087 (citation omitted). Thus, " 'where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c).' " *Id.* (quoting *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 13, 71 S.Ct. 534, 540, 95 L.Ed. 702 (1951)).

■ The Court finds that Defendants have failed to meet the section 1441(c) standard of showing that the other claims asserted in Plaintiff's Complaint are separate and independent from Plaintiff's claims under the Mississippi antitrust statute. As stated previously, Defendants merely argue that Plaintiff has no valid state law antitrust claim. The Court finds that this claim, along with all others asserted in Plaintiff's Complaint, should be decided by the state courts because the antitrust claim is a state law claim which is interlocked with and interdependent upon Plaintiff's remaining claims in the Complaint.

### C. *Federal Question Jurisdiction*

Defendants assert that Plaintiff is using artful pleading to avoid federal jurisdiction. According to Defendants, Plaintiff has no cause of action under state law because Plaintiff alleges an interstate conspiracy which should properly be brought as an alleged violation of the federal Sherman Act. Plaintiff asserts that this cause of action is valid under state law, and that Defendants

---

**4.** The Court is assuming in making this determination that there can be fraudulent joinder of

claims, as Defendants assert, as opposed to fraudulent joinder of persons.

have failed to prove the necessary elements for the artful pleading doctrine.

Federal jurisdiction extends over "only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Board of California v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2855–56, 77 L.Ed.2d 420 (1983). Under the well-pleaded complaint rule, the federal question must be present on the face of the complaint, *Gully v. First National Bank,* 299 U.S. 109, 113, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936), and jurisdiction cannot be based on the existence of a federal defense. *Trans World Airlines, Inc. v. Mattox,* 897 F.2d 773, 787 (5th Cir.), *cert. denied,* 498 U.S. 926, 111 S.Ct. 307, 112 L.Ed.2d 261 (1990). "[F]or federal question jurisdiction to exist, the federal law must be a direct element in the plaintiff's claim and . . . it is not enough that it comes in remotely or indirectly." 13B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3562 (1984).

The Court finds that Defendants have failed to show that Plaintiff's claims are only cognizable, if at all, under federal law. As noted previously, Plaintiff has stated, on the face of the Complaint, an arguably valid cause of action under Miss.Code Ann. §§ 75–21–1, 75–21–3 and § 75–21–7, the penalty provision of the antitrust statute. Defendants' argument that the facts set forth in the Complaint do not state a valid cause of action under that statute is an argument which should be made to the state courts in a motion to dismiss once this case is remanded. Defendants have failed to offer any Mississippi case which has held that the Mississippi antitrust statute applies only to intrastate, as opposed to interstate, violations of the statute. Until the state courts have so ruled,

this Court will not speculate concerning this area of state law, especially in deciding a Motion to Remand.[5]

The only exception to the well-pleaded complaint rule, which might be applicable to this case,[6] is whether federal antitrust law completely preempts state antitrust law such that Plaintiff could not maintain an action in state court. The United States Supreme Court has specifically ruled that state antitrust indirect purchaser statutes are not preempted by federal law. *California v. ARC America Corp.,* 490 U.S. 93, 102, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Therefore, Plaintiff's claims are not preempted by federal law.

The Court finds that there is no apparent federal question on the face of Plaintiff's Complaint, and that Plaintiff has asserted only state law causes of action in the Complaint. Furthermore, federal antitrust law does not preempt the state statutes at issue in this case. Removal based upon federal question jurisdiction is therefore improper.

### III. *Conclusion*

The Court finds that Plaintiff's Motion to Remand should be granted. Plaintiff has asserted, on the face of the Complaint, a valid cause of action pursuant to Miss.Code Ann. § 75–21–7 (rev. 1991). The Court makes no finding regarding the other causes of action asserted by the Plaintiff or whether such causes of action are cognizable under state or federal law. These claims cannot be separated pursuant to 28 U.S.C. § 1441(c). The Court will therefore remand the entire case to state court. *See McKay,* 769 F.2d at 1087.

Because the Court has considered the Surreply Memorandum, the Court will grant Defendants' Motion to File Surreply Memorandum. The Plaintiff's Application for Review is now moot because this case is being re-

---

5. The Court is not required to make an *Erie* guess in the context of a Motion to Remand concerning how the Mississippi state courts would rule on this issue of state law. The Court will not usurp the function of the state court in determining the meaning of the Mississippi antitrust statute in a case instituted in a state court.

6. Although Plaintiff raises the res judicata exception to the well-pleaded complaint rule, there is no federal judgment which would act as a bar to Plaintiff's state law claims. *See Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Powers v. South Cent. United Food & Commercial Workers Unions,* 719 F.2d 760, 766 (5th Cir.1983).

manded to state court and is therefore denied.

Plaintiff has requested an award of attorneys' fees incurred in opposing this removal. Plaintiff asserts that Defendants have acted egregiously in removing this case when they knew it should remain in state court. The Court finds that the legal arguments presented by Defendants to support their opposition to Plaintiff's Motion to Remand were not frivolous nor presented solely for delay, and that an award of attorneys' fees is therefore not proper in this matter.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Remand should be and hereby is granted. This matter is hereby remanded to the Circuit Court of Holmes County, Mississippi.

IT IS FURTHER ORDERED that Plaintiff's request for attorneys' fees is hereby denied.

IT IS FURTHER ORDERED that Defendants' Motion for Leave to File Surreply Memorandum should be and hereby is granted.

IT IS FURTHER ORDERED that Plaintiff's Application for Review and Objections to Magistrate Judge's Order Denying Motion to Quash and for Protective Order is moot and therefore denied.

SO ORDERED.

**HERR–VOSS CORPORATION, Plaintiff,**

v.

**DELTA BRANDS, INC. and Samuel F. Savariego, Defendants.**

Civ. A. No. 3:92–CV–0891–P.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 31, 1995.

**36**

Daniel V. Thompson, P. Talmage Boston, Jr., Dallas, TX, for defendants.

Robert D. Yeager, Kirkpatrick & Lockhart, Pittsburgh, PA, David H. Judson, Hughes & Luce, L.L.P., Dallas, TX, for plaintiff.

## MEMORANDUM OPINION and ORDER

SOLIS, District Judge.

A six-day nonjury trial was held in this patent case beginning March 21, 1995. After a careful review of the evidence presented at trial and the applicable law, the Court finds that there was no infringement of the United States Patent No. 4,614,101. The Court also finds the United States Patent No. 4,614,101 is invalid.

### BASIS OF SUIT

Plaintiff, Herr–Voss Corporation ("Plaintiff") claims that the defendants, Delta Brands, Inc. and Samuel F. Savariego ("Defendants") induced infringement of the patent in suit, U.S.Patent No. 4,614,101 ("the '101 patent"), and that such acts of inducing infringement were willful. Plaintiff asserts that this is an exceptional case based on its claim that Defendants willfully induced infringement of the '101 patent.

Defendants deny that they have induced infringement, and claim that the '101 patent is invalid. Defendants assert that this is an exceptional case based on their claim that Plaintiff's claims are frivolous.

### STIPULATED FACTS

1. The '101 patent, entitled "Method of Rewinding Slit Metal Strands," was issued on September 30, 1986.

2. The '101 patent names Augustine A. Fornataro as inventor. Mr. Fornataro is the President of Herr–Voss, Plaintiff.

3. Plaintiff is the owner of the '101 patent and has been since its issuance.

4. The invention claimed in the '101 patent relates to a method for rewinding slit metal strands.

5. A significant portion of the business of both Plaintiff and Defendants is the manufacture of machinery to alter and/or to improve the characteristics of strip material starting with a master coil and ending with coils suitable for the user's intended purpose.

6. Flat–Rolled Steel Products constitute a major classification of steel products. Flat-rolled products include sheet, strip, plate, etc.

7. There are two major categories of flat-rolled products: (1) hot-rolled products are reduced to final thickness by heating and rolling at elevated temperatures; (2) cold-rolled products are really "cold finished" products since most of the earlier thickness reduction occurs while the product is hot. Cold rolling is carried out on products which have not been heated immediately prior to the cold-rolling operation when they are reduced to final thickness.

8. Strip, hot-rolled or cold-rolled, is produced in very long length with width up to twelve feet and with the thickness of strip ranging from 0.005 inches to 0.250 inches.

Given the long length of strip, it is usually stored in a coil.

9. A master coil is a coil of strip whose width is essentially the same as it was at the completion of the rolling process in the steel mill. A master coil may be converted into two or more coils of narrower width by making continuous cuts along the length of the strip in a slitting process.

10. The equipment used in a slitting process generally includes a payoff reel to support the master coil for purposes of feeding the full width of the master coil into a slitter which employs pairs of opposed circular knives to slit or shear the full width strip into multiple strands (or "mults") of desired widths.

11. The individual strands are rewound as coils on a rotating mandrel called a recoiler. These slit coils are produced for a consumer user who in turn produces steel forms or shapes by a variety of blanking or forming techniques.

12. A slitting line typically includes a payoff reel, a slitter and a recoiler.

13. The objective of the slitting operation is to process a master coil supported on the payoff reel by controlling the strip so that it is continuously fed through the knives of the slitter, where it is slit into the desired number of mults and widths, and, finally, to rewind the multiple strands onto the recoiler.

14. In order that the multiple coils produced by the slitting process may be further processed safely and conveniently by an end user, it is desirable that each of the coils be tightly wound and secured by applying a circumferential strap or band so that the individual coil can be removed from the recoiler mandrel and transported to the end user without fear of the coil unraveling.

15. The production of tightly wound coils on the recoiler or a slitting line is usually complicated by the profile of strip of the master coil typically produced in the steel mill. Steel strip from a master coil rarely has consistent thickness.

16. Across the width of the strip, the edges of the strip are almost always thinner than the center. This center "crowning" is the result of the rolling process in the steel mill. Although every attempt is made to reduce strip crowns, crown remains in varying degrees in all strip.

17. In the slitting process, the payoff reel serves two functions: (1) it supports the coil of strip on a rotatable mandrel and (2) it provides the necessary back tension for controlling and/or recoiling the strip.

18. The recoiler in a slitting line recoils the slit mults on a mandrel. The recoiler is driven by a motor which, in effect, pulls the slit mults toward the recoiler against the back tension provided by the payoff reel and other devices in the slitting line.

19. The slitter may be driven by its own motor or may be undriven. If the slitter is undriven, then power for slitting is provided by the recoiler pulling the mults through the slitting knives.

20. In the slitting process, the strip from the master coil moves through the slitter at one velocity and all of the strands provided by the slitter exit the slitter at the same velocity. The resulting strands have varying thicknesses that result from the crown of the strip.

21. Because the rotational speed of the recoiler is the same across the width of the mandrel on which the slit strands are recoiled, the recoiler makes the same number of wraps for each strand being recoiled. However, the varying thickness of the strands results in the diameter of the coils of thicker strands increasing at a rate greater than the growing diameters of the thinner strands.

22. These diameter differences cause each mult to be wound at a velocity that is proportional to the particular diameter of the coil being formed on the mandrel.

23. These differences in velocity of the mults cause the pull of the recoiler to migrate to the thicker strands associated with the larger diameter coils, leaving the thinner strands loose.

24. The migration of tension to the thicker strands results from their being wound at a higher velocity relative to the thinner strands thus generating slack at the thinner strands

causing the thinner strands to droop and wind up loosely on their respective coils. Such loose coils are unacceptable to the end user because they can neither be handled safely nor processed readily in subsequent operations.

25. Neither Plaintiff nor Defendants have ever possessed the capability of fully testing slitting equipment at their facilities.

26. Plaintiff tested the patented method at the facilities of Samuel, Son & Company ("Samuel, Son") in Ontario, Canada, in the late 1976—early 1977 time frame and in June of 1980.

27. Mr. Fornataro filed the application for the '101 patent on December 1, 1981.

28. The application was prosecuted in the U.S. Patent and Trademark Office ("PTO") through several rejections by the Examiner on various grounds.

29. After a final rejection by the Examiner, Plaintiff appealed the rejection to the Board of Appeals of the PTO. The Board reversed the Examiner's rejections and the '101 patent issued.

30. The '101 patent contains five claims, but only the first four are placed in issue by Plaintiff.

31. In 1987, Steel Warehouse of Wisconsin, Inc. ("Steel Warehouse") was an active customer of Delta.

32. After a written quotation was submitted by Defendant Savariego to Steel Warehouse on July 6, 1987, Steel Warehouse ordered the first Delta Equalizer for its strip processing line at a price of $450,000.00.

33. Defendant Savariego was the author of the brochure entitled "Equalizer" that was used by Defendants early on to market its product.

34. There is no dispute that Defendants initially encouraged Steel Warehouse to use the Delta Equalizer in both full-width and slitting operations.

35. Defendants commenced the manufacture of the first Equalizer for Steel Warehouse in July 1987 and completed it in March 1988. On March 14, 1988, the equipment specified in Defendants' quotation, including the first Equalizer, was shipped to Steel Warehouse and thereafter was installed in the Milwaukee, Wisconsin facility of Steel Warehouse. Defendants sold another Equalizer as part of a slitting line to Huntco Steel, Inc., in Arkansas; Plaintiff has no evidence at present that the use of that Equalizer has infringed the claims of the '101 patent.

36. The equipment Defendants sold to Steel Warehouse, which included the Equalizer, was designed to permanently elongate and tightly wind both full-width and slit mults of steel. The parties are in dispute as to whether the Equalizer was in fact capable of working with slit material.

37. In 1988, Mr. Leroy Lance was assigned by Defendants to be the responsible field service technician for the Delta Equalizer at Steel Warehouse.

## STIPULATIONS OF LAW

1. If Delta Brands, Inc. is liable for inducing infringement of a claim of the '101 patent, then Savariego is individually, jointly and severally liable therefor as a result of his controlling position at Delta Brands, Inc.

2. Defendants are liable for inducing infringement if the Court concludes (1) Steel Warehouse has directly infringed the '101 patent and (2) the patent is valid.

3. Plaintiff's testing activity at Samuel, Son raises no prior art bar to the patentability of the claims of the '101 patent. Defendants contend that the testing is highly relevant to the Best Mode defense.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

### I. INFRINGEMENT

1. One who actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b). Plaintiff bears the burden of proving by a preponderance of the evidence that Defendants infringed the '101 patent. *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858, 868 (5th Cir.1973) (citations omitted); *Buehler AG v. Ocrim,* 836 F.Supp. 1305, 1319 (N.D.Tex.1993) (*citing Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758

(Fed.Cir.1984)). (*See attached* U.S.Patent No. 4,614,101 and Prior Art Statement.)

2. A determination of literal infringement requires the court, as a matter of law, to construe the patent's claims for the scope of the invention and then determine whether a claim "reads on" the accused device. *Buehler AG*, 836 F.Supp. at 1319 (*citing Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985)).

3. The patent's specification is the primary source for construing the words of a patent's claim elements. *Id.* (*citing Arachnid, Inc. v. Medalist Mktg. Corp.*, 972 F.2d 1300, 1302 (Fed.Cir.1992)). Unless specifically stated, a claim is not limited by references to a preferred embodiment or to an advantage of the invention. *Id.* (citations omitted).

4. The court may utilize extrinsic evidence to assist in the claim construction. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed.Cir.1995). Extrinsic evidence includes expert and inventor testimony, dictionaries, and learned treatises, which may be helpful in ascertaining the meaning of scientific principles, technical terms and terms of art that appear in the patent and prosecution history. *Id.* at 980.

5. However, "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim [of the patent]." An objective test of what one of ordinary skill in the art at the time of the invention would have understood a disputed claim term to mean is the focus in claim construction. *Id.* at 985–986.

6. The failure of an allegedly infringing device to read on even a single claim limitation negates literal infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991).

7. To protect the patentee against devices incorporating insignificant changes to avoid literal infringement, the courts formed the doctrine of equivalents, finding an accused invention performing substantially the same function in substantially the same way to obtain the same result infringes on the patent. *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.1973).

8. A finding of equivalence is a determination of fact involving a question of law, the construction of the patent. *Continental Oil Co. v. Cole*, 634 F.2d 188, 198 (5th Cir.1981).

9. Patent claims are to be construed in light of the description and to cover the real invention found in the specification and drawings. *Ziegler*, 483 F.2d at 869.

10. Equivalency is determined by examining the scope of the prior art, which is the essence of the invention and the advancement afforded by the invention. *Continental Oil*, 634 F.2d at 191. A pioneer patent commands broader protection than a patent merely improving upon what is already known. *Id.*

11. Equivalency "does not require complete identity for every purpose and in every respect.... Consideration must be given to the purpose for which an ingredient is used in a patent, the equalities it has when combined with the other ingredients, and the function which it is intended to perform." *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

12. The claims define the scope of the protection afforded by a patent. *Ziegler*, 483 F.2d at 869.

13. Claim 1 of the '101 patent describes a method of coiling three or more metal strands into uniformly tight coils. *See* PX 1 ('101 patent), col. 1 ("This invention relates to the rewinding of strands ... into uniformly tight coils ..."). The stipulated facts and extrinsic evidence supports Defendants' assertion that the term "multiple strands" in Claim 1 is shackled to the meaning of the term of art "mults" which means three or more strands. The scope of the '101 patent encompasses the method of slitting steel into three or more strands and does not encompass splitting operations which produce two strands.

14. Claim 1 of the '101 patent further intended the strands to be selectively worked

**40**

while moving through the process of reverse bending. *See* PX 1, col. 2 ("I preferably work the strands selectively by subjecting them to repeated reverse bending under tension less than the tensile yield strength of the metal.").

15. Recognizing that the tension of the pay-off reel, slitter, and recoiler alone is insufficient to elongate and thin the strands, Claim 1 of the '101 patent intends the stated sources of tension must be combined with repeated reverse bending of the strands to achieve the result of elongation and thinning of thicker strands relative to the thin. *See* PX 1, col. 2 ("Tension in the strands ... is a function of the current supply to the drive motors of the pay-off reel, slitter, and recoiler, the work of the slitting process, and the work associated with the repeated bending strain reversals.... While tension alone below the tensile yield strength of the metal will not elongate and thin the strands, tension in combination with repeated bending reversals of the strands can elongate them and reduce their thickness."); PX 1, col. 3 ("The net effect is to elongate and thin the thicker strands relative to the thin, which is an object of this invention.").

16. Claim 2 of the '101 patent is intended to specify that, utilizing the method of claim 1, the thicker strands are not permanently deformed to substantially the same thickness as the thinner strands. *See* PX 1, col. 2 ("... I selectively work the strands so as to elongate and simultaneously thin out the thicker strands more than the thinner strands."). There was much dispute by the parties as to this issue. Ultimately, the Court is persuaded by the language in the prior art statement that distinguishes the patent in suit from the Kinnavy patent. The language used to describe the '101 patent is:

> The method of selectively working the strands comprises subjecting all strands to reverse bending while applying tension thereto less than the tensile yield strength of the strands. The thicker strands thereby elongated more than the thinner strands.
>
> The Kinnavy patent discloses a method of permanently elongating strip by applying tension thereto and reverse bending it so

as to exceed the yield strength of the metal. It does not deal with the tensioning of slit strip in multiple.

17. The Court finds this language to describe two primary distinctions between the patent in suit and the Kinnavy patent. First, the Kinnavy patent worked by permanently elongating strip, that is in the plastic range of the metal, while the '101 patent works by temporarily elongating the metal, that is in the elastic range. Second, the '101 patent method applied to multiple strands of slit metal, while the Kinnavy patent worked only with a single strip or uncut metal.

18. The Court is not persuaded by Plaintiff that the term "elongate" without a modifier means "permanent elongation" in the industry. The term can mean both permanent and temporary elongation. The language used by Mr. Fornataro in the prior art statement suggests he was describing his process as utilizing temporary elongation as opposed to Kinnavy's method utilizing permanent elongation.

19. Claim 3 of the '101 patent describes selective working of the strands, utilized in the method of Claim 1, as the combination of reverse bending and tension below the tensile yield strength of the metal. *See* PX 1, col. 2 ("I preferably work the strands selectively by subjecting them to repeated reverse bending under tension less than the tensile yield strength of the metal.").

20. Claim 4 of the '101 patent specifies that the reverse bending of Claim 3 is effectuated by passing the strands between an unspecified number of parallel but offset rolls. PX 1, col. 2 ("Those strands are passed through a strand tensioning apparatus comprising a plurality of parallel upper rolls, offset respectively in the direction of strand travel from a plurality of parallel lower rolls, but overlapping them in the path of strand travel so as to bend the strand downwardly and upwardly in reverse fashion as the strands pass through the rolls.").

21. Plaintiff's evidence fails to establish that the repeated reverse bending element of Claim 1 reads on the accused process. The '101 patent effectuates the elongation and thinning of metal strands by combining

tensions from the pay-off reel, slitter, and recoiler with the tension created in the repeated reverse bending. The accused process cannot be found to read on to the '101 patent because the accused process achieves thinning and elongation through the application of sheer tension above the yield strength in the pull of the recoiler. Additionally, the '101 patent works the strands for elastic deformation while the accused process effectuates plastic deformation. Consequently, Plaintiff failed to prove by a preponderance of the evidence that the accused process literally infringes the '101 patent.

22. Neither has Plaintiff proven by a preponderance of the evidence that the accused process infringes the '101 patent under the doctrine of equivalents. The '101 patent effectuates the temporary elongation and thinning of metal strands by combining tensions from the pay-off reel, slitter, and recoiler with the tension created in the repeated reverse bending below the yield strength. Conversely, the accused process effectuates thinning and elongation through the application of sheer tension above the yield strength in the pull of the recoiler to achieve permanent elongation. The single up and down reverse bending in the accused process is insufficient to add any significant amount of tension, unlike the '101 patent where repeated reverse bending is necessary to effectuate the elongation. The accused process does not perform in substantially the same way to achieve the same result. Therefore, Defendants did not induce infringement. of the '101 patent.

## II. INVALIDITY

Although Defendants waived their counterclaim of invalidity in the wake of a finding that Defendants did not induce infringement, for purposes of appeal the Court makes the following findings of fact and conclusions of law.

■■■■ 23. A presumption of validity arises from the issuance of a patent. *Continental Oil,* 634 F.2d at 195. The validity of a claim depends upon the claim having a clear and definite meaning when construed in the light of the complete patent document. *Standard Oil,* 774 F.2d at 448. The defendants bear the burden to prove invalidity by clear and convincing evidence. *Buehler,* 836 F.Supp. at 1324.

24. Defendants assert the defenses of public use or sale, obviousness, and best mode, urging the Court to find the '101 patent invalid.

### A. Public Use or Sale

■■■■ 25. Prior public use or sale of a process may invalidate a patent for the process. *See Mosler Safe v. Mosler, Bahmann & Co.,* 127 U.S. 354, 8 S.Ct. 1148, 32 L.Ed. 182 (1888); 35 U.S.C. § 102(b) (A person is entitled to a patent unless the invention was in public use or on sale in this country more than one year prior to the date of the application for the patent.).

■■■■ 26. The evidence presented at trial establishes that a slitting line with a Strand Tensioner was offered for sale by Plaintiff to the House of Metals as early as June 1979. *See* DX 21. Plaintiff does not deny that the process installed pursuant to the House of Metals sale encompassed the process described in the '101 patent. However, Plaintiff asserts the equipment was installed strictly for testing, experimental purposes, not for commercial sale. Plaintiff's only evidence to support this assertion is the testimony of Mr. Fornataro, president of Plaintiff, that the Strand Tensioner was at the House of Metals for testing purposes and that the House of Metals had been informed of the experimental nature of the equipment.

27. The Court is persuaded that the process sold to and used at the House of Metals equates with a commercial sale. Plaintiff's prior experimentation documented to have occurred at Samuel, Son was expressly denoted as experimental and specifically included test result reports (*see* DX 38). Conversely, none of the documentation presented as evidence to the Court indicates any communication to the House of Metals that the Strand Tensioner was being tested in their installation or that any test results were to be reported, in the pertinent time period.[1]

---

1. Dated March 1981, a trip report on "Strand    Tensioner Testing" indicates a representative of

Also, the price for which Plaintiff sold the experimental Strand Tensioner equipment to Samuel, Son (*see* DX 43) was significantly less than the price received by Plaintiff for the sale to the House of Metals (*see* DX 14e). Further, in the proposal process with the House of Metals, Plaintiff stated in written correspondence that it had satisfactorily tested the Strand Tensioner such that Plaintiff's belief in the design criteria was reaffirmed.

28. Contrary to Plaintiff's assertion, the evidence clearly supports the Court's determination that the Strand Tensioner offered for sale to and used by the House of Metals falls within the ambit of § 102(b). Accordingly, the Court finds the '101 patent is invalid.

## B. Obviousness

29. The defense of obviousness, if upheld, renders a patent invalid. *See* 35 U.S.C. § 103 ("[I]f the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, a patent may not be obtained.").

Plaintiff observed the processing of two coils of aluminum. DX 24. Due to the high quality of the coils prior to slitting, the testing was found to be inconclusive. However, in correspondence from Plaintiff to a West German company, Plaintiff stated that on February 10, 1981, it "established that the concept for the method of coiling into uniformly tight coils of multiple strands was effective." DX 23.